No. 61,944

STATE OF KANSAS, *Appellee*, v. STEVE R. COLWELL, *Appellant.*

(790 P.2d 430)

Opinion filed April 13, 1990.

*Steven R. Zinn,* deputy appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the briefs for appellant.

*Edwin A. Van Petten,* deputy attorney general, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the briefs for appellee.

The opinion of the court was delivered by

McFarland, J.: Steve R. Colwell appeals from his jury trial conviction of felony first-degree murder (K.S.A. 21-3401) and abuse of a child (K.S.A. 21-3609).

Kelli Gates was born on September 29, 1980, to the marriage of Brenda and Larry Gates. She was born six weeks prematurely and was in poor health for much of her first two years. A second daughter, Lindsay, was born to the Gates family on January 30, 1983. In October of 1984, the Gates' marriage ended in divorce with Brenda being granted custody of the two children. Brenda met defendant Steve Colwell in November 1984 and married him on March 9, 1985.

The Gates girls attended a day care center commencing in August of 1984. Its proprietor, Melissa Spaid, observed changes in Kelli commencing in late December 1984 or early January 1985. The child was losing weight, appeared frailer than usual, and started having bruises on her face. The bruising pattern described was consistent with her face being squeezed by fingers. The child complained of not feeling well. Brenda took Kelli to a Wichita pediatrician, Dr. Katherine Pennington, in March 1985. The doctor suggested Kelli be seen by a specialist in child hematology if the bruising continued. By April, bruises had appeared on other parts of the child's body. On May 9, 1985, Larry Gates took Kelli to her appointment with Dr. Pennington. He asked if the bruising could be from child abuse. The doctor stated she did not think so and attributed the bruising to a blood abnormality.

In May 1985, Kelli fell from a swing at the day care center and was treated for a broken collarbone. No blood disease showed up in tests performed at that time. During Larry's visitation with

his children about June 15, 1985, he noticed bruises on Kelli's buttocks. He took her to a hospital for treatment. On June 17, 1985, he reported suspected child abuse of Kelli to the Wellington Social and Rehabilitation Services office. A caseworker investigated the complaint, found no evidence of child abuse, and closed her file.

Kelli's condition deteriorated and she became very weak. About July 15, 1985, Larry advised Brenda he was very concerned about the child. Brenda advised she had talked to Dr. Pennington about hospitalizing Kelli for tests.

On the morning of July 17, 1985, the two girls and their stepfather, defendant, were home alone. Kelli became unconscious and stopped breathing. She was taken by ambulance to the Wellington hospital, then airlifted to Wesley Medical Center in Wichita. She died the following day. An autopsy was performed on July 18, 1985, by Dr. David DeJong. He observed multiple bruises on various parts of her body. She had a new fracture to the collarbone which was close to the healing fracture. Death was found to have been caused by rebleeding from a subdural hematoma. The original injury was estimated to be several weeks old, and the rebleeding was fresh. He believed two traumas were involved and concluded Kelli's brain injuries were the result of child abuse.

On June 29, 1987, defendant was charged with felony murder and child abuse. For reasons not found in the record, this action was filed and prosecuted by an assistant attorney general. Defendant was found guilty on both counts and appeals therefrom. Other facts will be set forth as necessary for the discussion of particular issues.

For his first issue, defendant contends our decision in *State v. Lucas*, 243 Kan. 462, 759 P.2d 90 (1988), affirmed on rehearing in *State v. Lucas*, 244 Kan. 193, 767 P.2d 1308 (1989), precludes his conviction of felony murder based upon the underlying felony of child abuse. The State's only eyewitness, Lindsay Gates, testified Kelli died after having been beaten by defendant. The State proceeded on the theory that defendant inflicted cruel corporal punishment upon Kelli on July 17, 1985, and that this caused the rebleed from the subdural hematoma which resulted in Kelli's death.

In *State v. Lucas*, we held:

"The purpose of the felony-murder doctrine is to deter those engaged in felonies from killing negligently or accidentally, and the doctrine should not be extended beyond its rational function which it was designed to serve." Syl. ¶ 1.

"In order to apply the felony-murder doctrine: (1) the underlying felony must be one which is inherently dangerous to human life; and (2) the elements of the underlying felony must be so distinct from the homicide so as not to be an ingredient of the homicide." Syl. ¶ 2.

"A single assaultive incident of abuse of a child (K.S.A. 1987 Supp. 21-3609) which results in the death of a child merges with killing and constitutes only one offense. The coupling together of prior acts of abuse of a child with the lethal act of abuse into one collective charge of abuse of a child does not prevent the operation of the merger rule. Language to the contrary found in *State v. Brown*, 236 Kan. 800, 696 P.2d 954 (1985), is disapproved." Syl. ¶ 5.

*Lucas* was followed by *State v. Prouse*, 244 Kan. 292, 767 P.2d 1308 (1989), and held to be controlling. The case herein was tried prior to the time our decision in *Lucas* was announced. K.S.A. 21-3401 was amended by the 1989 Legislature to provide felony murder may be predicated upon abuse of a child, but that has no bearing on the issue before us as the events herein preceded the amendment.

The State asks that we overrule *Lucas*. This we decline to do. As *Lucas* is controlling, the conviction for felony first-degree murder must be reversed.

Some of the other issues by defendant relate only to the felony-murder conviction. These are rendered moot by our reversal of the felony murder and will not be discussed. The balance of the opinion will be devoted to issues raised as are relevant to the child abuse conviction.

Defendant claims the trial court erred in requiring defense counsel to accept the State's offer to stipulate that Dr. William Eckert was a qualified expert in the field of pathology. We agree.

In *State v. Wilson*, 215 Kan. 28, 523 P.2d 337 (1974), we held as follows:

"In a criminal prosecution an offer by the defendant to stipulate remains merely an offer unless accepted by the prosecution." Syl. ¶ 4.

"In a criminal prosecution the making of an admission by the defendant does not bar the state from proving the fact independently as though no admission had been made." Syl. ¶ 5.

In *Barnes v. St. Francis Hospital & School of Nursing*, 211 Kan. 315, 319, 507 P.2d 288 (1973), we said that the weight given to an expert witness' testimony "was a matter for the jury to decide, and in determining that question, the jury was entitled to consider the degree, the depth and the sources of his knowledge in those areas about which he testified."

Eleven pages of the record herein are taken up with the State's qualification questions to its pathologist, Dr. DeJong. It was the conclusion of Dr. DeJong that Kelli's rebleed (and resulting death) was caused by child abuse occurring July 17, 1985. Dr. DeJong was the pathologist who actually performed the autopsy.

The defense presented Dr. Eckert, who is known to this court to have a national reputation in the field of forensic pathology. The jury was prevented, by the trial court's ruling, from learning of Dr. Eckert's credentials. To the jury, he was merely a pathologist who examined Dr. DeJong's records and reached the conclusion that Kelli did not die as the result of child abuse. Interestingly, Dr. DeJong changed his mind on his conclusion that Kelli died from child abuse a few months after the trial. One of the factors involved in DeJong's position change was he had learned that Dr. Eckert had not agreed with his findings, and DeJong had a great respect for Eckert's experience and reputation.

Which expert the jury believed was crucial in this case. The only other witness to testify as to any child abuse resulting in Kelli's death was Lindsay, who, at age four years and nine months, testified she had seen defendant beat Kelli on the day in question. Lindsay was testifying as to events occurring when she was not quite two and a half years old.

We conclude that an offer by the State to stipulate to the qualifications of an expert witness called by the defendant is merely an offer unless accepted by the defendant. Absent such acceptance, the defendant has the right to present the witness' qualifications to the jury.

Does this trial error constitute reversible error? Errors which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining do not require reversal

when substantial justice has been done. *State v. Bell*, 239 Kan. 229, Syl. ¶ 2, 718 P.2d 628 (1986). See K.S.A. 60-261.

We conclude defendant's conviction for child abuse must be reversed as the error may well have affected the outcome of the trial.

Because certain other issues involve matters which may occur again upon any retrial herein, we deem it appropriate to discuss those issues.

Defendant contends the trial court abused its discretion in finding Lindsay was competent to testify.

Prior to trial, defendant filed a motion in limine to have Lindsay declared incompetent to testify as a witness because of her tender years. Lindsay was, at the time of Kelli's death, two years and five and one-half months old. At trial, a hearing was conducted out of the hearing of the jury to determine Lindsay's competency. Counsel for the State and defendant each questioned Lindsay, following which defense counsel stated that Lindsay passed the "bare minimum requirement of *State v. Thrasher* [233 Kan. 1016, 666 P.2d 722 (1983)] as to the duty to tell the truth." Defense counsel, however, reserved all other objections to her proposed testimony. The trial court then held Lindsay was competent to testify.

K.S.A. 60-407 provides in pertinent part: "Except as otherwise provided by statute (a) every person is qualified to be a witness, and . . . (c) no person is disqualified to testify to any matter . . . ."

The disqualification of a witness is codified in K.S.A. 60-417, which provides:

"A person is disqualified to be a witness if the judge finds that (a) the proposed witness is incapable of expressing himself or herself concerning the matter so as to be understood by the judge and jury either directly or through interpretation by one who can understand him or her, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth. An interpreter is subject to all the provisions of this article relating to witnesses."

In *State v. Thrasher*, 233 Kan. 1016, a four-year-old boy was permitted to testify against the defendant. On appeal, we upheld the testimony, stating:

"Kansas law does not disqualify a witness simply because of age.

"Under K.S.A. 60-407 a witness, no matter how young, is presumed competent to testify. The burden of establishing incompetency rests on the challenger. *State v. Poulos*, 196 Kan. 253, 263, 411 P.2d 694, *cert. denied* 385 U.S. 827 (1966). K.S.A. 60-417, in turn, directs to the discretion of the trial court the disqualification of a witness for any of the enumerated reasons. *State v. DeLespine*, 201 Kan. 348, 351, 440 P.2d 572 (1968). See also *State v. Jones*, 204 Kan. 719, 727-28, 466 P.2d 283 (1970); *State v. Whiting*, 173 Kan. 711, 713, 252 P.2d 884 (1953); *State v. Gaunt*, 98 Kan. 186, 157 Pac. 447 (1916). Thus, in order for a witness to be disqualified, the trial court must be convinced the witness is incapable of expressing himself concerning the matter so as to be understood by the judge and jury, or is incapable of understanding the duty of a witness to tell the truth. *State v. Poulos*, 196 Kan. at 264." 233 Kan. at 1018.

The test, therefore, for the disqualification of a witness is whether or not the witness (1) is incapable of expressing himself or herself concerning the matter so as to be understood by the judge and jury, or (2) is incapable of understanding the duty of a witness to tell the truth.

Since defendant conceded that Lindsay understood the duty to tell the truth, our examination concerns her capability of expressing herself concerning the matter so as to be understood by the judge and jury.

At the time of her testimony, Lindsay was four years and nine and one-half months old. Lindsay testified she was able to remember the ambulance coming and gave her perception of why Kelli died: "From him [defendant] beating up [Kelli]." When she did not remember something, she so stated. She testified that she did not go outside to play on the day Kelli died. This latter testimony was important as defendant testified that the girls were outside playing that morning, after which Kelli came in the house and immediately collapsed. Lindsay testified they had not been outside, and that Kelli had been struck by defendant inside the house. As the cause of the trauma resulting in the rebleeding was at the heart of the issue herein, such testimony was significant.

Lindsay's testimony was not script perfect and lacked some continuity, but this is a matter of the weight to be afforded her testimony rather than her competency to testify. We find no abuse of discretion on this issue.

For his next issue, defendant contends that a child psychologist, Dr. David Seifert, was improperly allowed to vouch for the credibility of Lindsay.

Admission of expert testimony is governed by K.S.A. 60-456(b) and (d):

"(b) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness.

. . . .

(d) Testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."

The basis for the admission of expert testimony is necessity arising out of the particular circumstances of the case. To be admissible, expert testimony must be helpful to the jury. Where the normal experience and qualifications of lay persons serving as jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are inadmissible. *State v. Hodges*, 239 Kan. 63, 67, 716 P.2d 563 (1986). An expert's opinion, pursuant to K.S.A. 60-456, is admissible up to the point where an expression of opinion would require him to pass upon the credibility of witnesses or the weight of disputed evidence. *State v. Lash*, 237 Kan. 384, Syl. ¶ 1, 699 P.2d 49 (1985). Although an expert may give an opinion on an ultimate issue as provided in K.S.A. 60-456(d), such witness may do so only insofar as the witness aids the jury in the interpretation of technical facts or assists the jury in understanding the material in evidence. An expert witness may not pass on the weight or credibility of evidence, for those matters are strictly within the province of the jury. *State v. Moore*, 230 Kan. 495, Syl. ¶ 1, 639 P.2d 458 (1982).

The admissibility of expert testimony lies within the sound discretion of the trial court, and its determination will not be reversed on appeal absent a showing of an abuse of discretion. *State v. Stukey*, 242 Kan. 204, Syl. ¶ 1, 747 P.2d 137 (1987).

In *State v. Lash*, 237 Kan. 384, the defendant was accused of sexually molesting his fifteen-year-old son. A psychologist who

interviewed the son gave expert testimony. He was asked for his opinion, based on testing and interviewing the son, whether the son had been sexually molested by the father. Over defendant's objection, the court permitted the psychologist to testify as to whether he had an opinion whether the son had been sexually molested but would not permit the expert to testify as to whether the son had been sexually molested by the father. 237 Kan. at 384-85. The defendant was acquitted. The State appealed on a question reserved as to whether the trial court erred in not permitting the expert to testify that in his opinion the son had been sexually molested by the father. We affirmed the lower court's ruling, stating that the prosecutor's question was improper because it called for an opinion which would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. 237 Kan. at 386.

In *State v. Jackson,* 239 Kan. 463, 721 P.2d 232 (1986), the trial court permitted two expert witnesses, social workers with expertise in child abuse treatment, to testify that "in their opinions the child was telling the truth and in their opinions the defendant committed the acts of molestation with which he was charged." 239 Kan. at 470. We reversed the conviction, stating that the experts attempted to serve as human lie detectors for the child and each told the jury that the child was truthful and the defendant was guilty as charged. We said, "We are convinced that it was the function of the jury to hear the testimony of the witnesses as to what the child said, and then to make a determination of the reliability of the child's statements." 239 Kan. at 470.

In *State v. Clements,* 241 Kan. 77, 734 P.2d 1096 (1987), defendant was accused of sodomizing an eleven-year-old child. Defendant denied any act of sodomy had taken place. A mental health therapist, with expertise with sexually abused victims, saw the victim in counselling seven times. Over defendant's objection, he testified that the boy's progress in therapy was consistent with what he would expect when a young boy was sodomized under such circumstances. 241 Kan. at 78-79. We found the testimony to be proper, reasoning:

"Although the complained-of testimony was close to the line of impermissibility, it does not cross the line. The witness did not give an opinion as

to whether or not P.V. was telling the truth. Rather, the testimony may be compared to a situation where a patient tells his treating physician he had been held without food and water in a certain type of environment, and the physician testifies the victim's initial condition and progress in treatment are consistent with the events related to him by the patient. The physician, under such circumstances, is not testifying that any particular person committed a criminal act against his patient or that his patient is telling the truth as to how or by whose acts he suffered injury. The door is thus left open to cross-examination relative to other causal circumstances which might also be consistent with the physician's opinion as to his patient's condition and progress." 241 Kan. at 80.

Dr. Seifert testified herein that he had seen Lindsay over an extended period of time. As a result of his observations and testing, he concluded Lindsay was capable of distinguishing the truth from a lie. He did not testify that he believed Lindsay was telling the truth in her narration of the events involved in Kelli's death.

The witness testified Lindsay had suffered emotional trauma in witnessing "the demise of her sister." This would be traumatic to a child, whatever the circumstances involved, and is not impermissible. The witness gave the following testimony:

"Q [By State's attorney] And based upon your conversations with her in the clinical setting, could you relate to us what exactly it is that she saw?
"A According to her accounts, she saw her sister beated that led to that death.

. . . .

"Q What did Lindsay relate to you with regard to that?
"A A variety of things. She was in the immediate vicinity of the final stages of Kelli being removed from the house as well as alleging that she saw some of the events leading up to it.
"Q Did she indicate to you that she, at least in her opinion, knew how Kelli had died?
"A Yes.
"Q And what was her opinion with regard to that?
"A That Steve Colwell had, 'Beated her dead.' Beated her dead in quotes."

The witness was repeating what the child said without comment as to its credibility. In its totality, this witness' testimony came close to being an improper comment on Lindsay's credibility but did not cross over the line.

Defendant next contends the trial court improperly excluded testimony as to Lindsay's relationship with the defendant after Kelli's death.

For six months after Kelli's death, Lindsay was in foster care with Bethany Hostetler. During this period of time, Lindsay was visited by defendant at least once a week. Defense counsel called Ms. Hostetler as a witness to testify as to her observations as to the interactions between Lindsay and defendant. The trial court excluded such testimony on the ground it was immaterial.

It is difficult to see the basis for this ruling. Lindsay testified she was "scared" of defendant. This arose from the death of Kelli. One test for the credibility of this young child's words would be if they were consistent with her actions in defendant's presence after the event giving rise to her stated fear. A two- or three-year-old child presumably would have considerable difficulty maintaining a consistent position contrary to her true feelings about a person in such traumatic circumstances.

Unfortunately, defense counsel did not make a formal proffer as to what Ms. Hostetler's testimony in this regard would be. As she was called as a defense witness, obviously, defense counsel anticipated her testimony would be favorable. However, the record herein is devoid of any basis upon which reversible error could be predicated as to the exclusion of the Hostetler testimony in the claimed regard.

The final claim of error relates to the trial court's denial of a new trial based upon newly discovered evidence. In support of the motion, defense counsel presented Dr. DeJong's changed conclusion in regard to child abuse being the cause of Kelli's death, witnesses who saw the girls playing in the back yard that morning, and other matters. Inasmuch as the convictions herein are reversed and any proper new evidence could be admitted at any subsequent retrial, there is no purpose served by determining this issue.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

MILLER, C.J., and SIX, J., concurring in the result.

HERD, J., dissenting.