No. 80,022

STATE OF KANSAS, *Appellee,* v. THOMAS B. MULLINS, *Appellant.*

(977 P.2d 931)

Opinion filed April 16, 1999.

*Reid T. Nelson,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the briefs for appellant.

*Frank E. Kohl,* county attorney, argued the cause, and *Catalina M. Thompson,* assistant county attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Thomas B. Mullins appeals his convictions of aggravated criminal sodomy, K.S.A. 21-3506(a)(1), a severity level 2 person felony, and aggravated indecent liberties with a child, K.S.A. 21-3504, a severity level 3 person felony.

Mullins contends the trial court erred (1) in denying his motion for a new trial, (2) in admitting expert testimony from Pat Phillips, a registered nurse, that the victim had not been coached, and (3) in sentencing him.

Facts

The prosecution was based on testimony of Mullins' biological child, B.M., that he had initially been subjected to his father's "lewd touching," which escalated to sodomy. B.M. had not reported this to his divorced mother until after contact with Mullins had ceased because he had feared for his safety.

The defense theories were that no abuse occurred, that B.M. had been coerced in his testimony by his mother to assist in a requested adoption by her new husband, or that if the acts testified to had occurred, B.M. was confused about the molester, who may have been one of several boyfriends his mother had affairs with after divorcing Mullins.

Because there were no visual indications of physical or sexual abuse, and no witnesses to the alleged offenses, Mullins was convicted primarily based upon the testimony of B.M.

In order to set the stage for the consideration of the alleged errors, we will set forth in more detail the testimony of various witnesses who appeared at trial.

B.M.

B.M. was born July 20, 1985, and was 11 years old at the time of the trial. He testified that beginning in the fall of 1992, Mullins began touching his "front privates" underneath his clothing with both hands. This occurred during visitations at Mullins' mother's

house where Mullins lived. B.M. believed his father's threat that "if I told anybody he would kill me."

B.M. testified the abuse got worse after his 8th birthday. He testified he was punched and beaten, made to lay down on the bed, and Mullins would "get on top of me," where he "would move up and down with his front private in my back and it hurt." B.M. testified he was made to smoke cigarettes and drink beer and Mullins held a knife to his throat. This continued until B.M. was about 9 years old. He testified he was telling the truth and would not lie just to make his mom happy. He said he told his mother and the police what had happened to him because he felt safe once he moved away from Mullins. He said he loved his mother and wanted to be adopted by his stepfather.

A.R.

B.M.'s mother, A.R., testified he had lived with her during his entire life. Mullins' visitations were sporadic, sometimes weeks apart, and sometimes months apart. A.R. testified that on June 20, 1995, while having dinner with B.M. and her new husband, B.M. told them that Mullins had molested him. She said B.M. told her that Mullins would "hurt him and punch him and hold him down and say bad things to him." The day after this conversation, A.R. took B.M. to the Leavenworth Police Department where he was interviewed by and gave a statement to Detective Michael Jarowitz. She was not present in the room during this interview.

On cross-examination, A.R. admitted to a "fairly rocky relationship" with Mullins and his family. She denied several live-in arrangements; however, she admitted that she lived with several boyfriends when B.M. was younger. She denied leaving B.M. alone with any of her boyfriends. She testified to receiving a letter from her attorney in March 1995, stating that Mullins was believed to be willing to consent to the adoption of B.M. She denied knowing that Mullins had refused to sign the adoption consent form.

A.R. admitted lying to the police in 1993 concerning the burning of a car which had been accomplished by Mullins' brother, Danny. She denied Danny had ever lived with her. She testified that prior to B.M.'s revealing he had been molested, B.M. would become

violent and be subject to mood swings; however, his grades and behavior had improved dramatically since he told her about the abuse.

## Officer Jarowitz

Officer Jarowitz testified he was the first officer to interview B.M. He indicated B.M. was scared and embarrassed. B.M. told him that when he was about 7 years old "sometimes his dad would play with his private parts." In Jarowitz' written report, it was stated that he had been told by B.M. that his dad would "stick his penis in his rear, and when he would scream he would push his face into the pillow until he would stop screaming." Jarowitz testified B.M. said he waited to tell "[b]ecause he . . . was scared and Tom told him if he would tell anybody he would kill him and his family."

## Detective Pat Kitchens and Monica Mendoza

Monica Mendoza is a social worker who taped an interview of B.M. with Pat Kitchens present. B.M.'s mother was not there. Kitchens' testimony was that B.M.'s statements were consistent with those previously made. Essentially, the testimony was that Mullins fondled B.M.'s "front privates" when he was 7 years old and the acts changed from mere fondling to acts of sodomy after B.M.'s 8th birthday. Kitchens' stated B.M. said he had been threatened with a knife should he tell anyone. Kitchens admitted he did not interview any of B.M.'s teachers or counselors. He also said a search of Mullins' bedroom revealed a knife, but it was not the one involved.

## Pat Phillips

Pat Phillips is a registered nurse who is the assistant director for the sexual abuse program at KU Medical Center, the children's center. She has B.S. in nursing from KU and a Masters in pediatrics nursing from the University of Florida. She was trained to be a pediatric nurse practitioner, has performed gynecological exams, and worked with Dr. Adams, a pediatrician an expert in the field of sexual abuse studies at KU. She is trained to take histories from families and children, as well as perform physical examinations. She

has performed over a thousand sexual abuse examinations and has been qualified as an expert in all of the Kansas counties surrounding the Kansas City area.

Phillips conducted a physical examination of B.M. in July 1995, took his history, and interviewed him regarding the allegations. She interviewed A.R. separately and generated a written report. Phillips testified B.M.'s physical exam was normal and showed no physical signs of sexual abuse. It was reported that B.M. suffered from constipation which resulted in large size and amount of stools. Phillips explained that physical indications of anal penetration were not present in 60 to 80 percent of the children sodomized. She indicated there were no signs that B.M. had been "coached," which is the basis for one of Mullins' allegations of error.

## Marie Mullins

Marie Mullins is Mullins' mother. She testified her son lived at her house at the time the alleged events took place. She had observed her son and B.M. interact and there was nothing which caused her to be concerned about their relationship. Marie testified that A.R. had a relationship with her other son, Danny, who lived with A.R. at one point. She testified that B.M. never indicated to her that Mullins was abusing him.

## Theresa Bocchino

Theresa Bocchino is Mullins' sister and testified she had been around her brother and B.M. and she had never witnessed anything which would cause her to be concerned about his safety. She testified A.R. had smoked marijuana in front of B.M. and that she had lived with her brother Danny for a little over a year.

## Jim Mullins

Jim Mullins is Thomas Mullins father. He testified that his son Danny had lived with A.R. for "pretty near two years."

## Roger Horsky

Roger Horsky was Mullins' attorney regarding his child support payments. He testified he did not recall Mullins telling him he

would sign any adoption papers although he may have related to A.R.'s attorney there was a good chance that Mullins would do so.

Danny Mullins

Danny Mullins is the defendant's brother. He testified he lived with A.R. for approximately 18 months and she smoked marijuana in front of B.M. on several occasions. He said he observed his brother and B.M. together and never observed any behavior that caused him to be concerned.

Thomas B. Mullins

The defendant testified and denied abusing B.M., either sexually or physically. He stated he would not give up his parental rights to B.M. and told this to A.R. Shortly after telling her that he would not consent to the adoption, he learned of the allegations that had been made against him.

The jury found Mullins guilty of both charges. He was sentenced to a pre-guidelines term of 15 years to life for the aggravated criminal sodomy consecutive to a post-guidelines term of 274 months for the aggravated indecent liberties conviction. Both parties agree the sentences were erroneously entered under the facts of this case.

*The trial court did not err in denying Mullins motion for a new trial.*

The scope of review of the trial court's denial of a motion for a new trial is whether the lower court abused its discretion. *Taylor v. State*, 251 Kan. 272, 276-77, 834 P.2d 1325 (1992). We held in *Taylor* that a new trial should not be granted on the grounds of newly discovered evidence unless the evidence is of such materiality that it would likely produce a different result on retrial. The credibility of the evidence offered in support of the motion is for the trial court's discretion. If there is substantial competent evidence to support the trial court's finding after an evidentiary hearing, such finding will not be disturbed on appeal. *Lloyd v. State*, 197 Kan. 389, Syl. ¶ 1, 416 P.2d 766 (1966).

The motion for a new trial resulted in several evidentiary hearings and was based on the prosecution's failure to furnish a medical report concerning B.M. until the time of trial. The factual basis for

this report was a June 23, 1995, examination of B.M. at the Douglas Community Health Center by Dr. Smith who issued a written report. Included in this report was a statement that in 1993, B.M. had been seen by Dr. Lohrenz, a counselor in Leavenworth, "because of a change in behavior" and numerous visits to Dr. Mills, a pediatrician, for other medical problems during the time of the alleged abuse.

On November 18, 1996, the day before testimony began in Mullins' trial, the prosecutor received Dr. Smith's report. It was furnished to Mullins' counsel immediately. Defense counsel objected that the report was late and highly prejudicial to Mullins because he had insufficient time to review the information. A continuance was requested for time to review the report and denial of Dr. Smith's testimony.

The trial court inquired of the prosecutor as to the delay. The response was that it had just been received. Dr. Smith had moved jobs from Douglas Community Health Center to KU Medical Center. When the State became aware that a report had been prepared, it had to get a signed release from B.M.'s mother, and that release had just been received. The prosecutor thought Dr. Smith had been endorsed as a witness, but such was not the case.

The trial court agreed to grant a continuance but noted it would be at least February until the matter could be heard. The trial court also indicated it would favorably consider granting a mistrial if the defendant so moved. After defense counsel explained the situation to Mullins, they decided to decline a continuance and proceed for trial in order to avoid an additional 2½ months of delay. The defense did not move for a mistrial, but the trial court excluded any testimony of Dr. Smith.

After the conviction, Mullins' new trial motion raised the fact he had been unable to present favorable evidence from Dr. Lohrenz and Dr. Mills. Dr. Lohrenz testified she had counseled B.M., but had no recollection of the meeting. Her ledger card showed appointments missed and she vaguely recalled discussing sexual abuse. For insurance purposes, she had diagnosed B.M. as having "an adjustment disorder and the child appeared to be both anxious and depressed, as best I could tell from such a brief contact."

At a later hearing, Dr. Mills, who was referenced in Dr. Smith's report, testified that he treated B.M. numerous times from March 10, 1992, through July 17, 1995. He testified that there were never any signs of sexual or physical abuse, although in March 1995, when treating B.M. for urination problems and large bowel movements, concern had been voiced that B.M. had been sexually abused. He made an entry on B.M.'s file reflecting the concern but said there was no physical evidence of sexual or physical abuse. He referred B.M. to Dr. Lohrenz for counseling. It clearly appears that the mother's concern about sexual abuse was not the reason for B.M.'s visit to Dr. Mills.

After the hearing, Mullins' counsel argued the testimony of Drs. Lohrenz and Mills was newly discovered and exculpatory, and in all probability his client would have been acquitted if this evidence would have been presented to the jury.

The prosecution countered that Dr. Smith's report was excluded from trial. All reports in their file were delivered immediately upon receipt and none of the information was exculpatory.

The trial court denied the motion for new trial, finding the State did not intentionally withhold any reports. Although the reports were late it was because they were discovered late, and the evidence discovered was not exculpatory.

On appeal, Mullins restates all of his arguments made in his motion for a new trial and contends we should reverse the trial court's determination.

The relevant portion of K.S.A. 22-3501 relating to new trial states: "(1) The court on motion of a defendant may grant a new trial to him if required in the interest of justice." In deciding if a new trial is warranted, Mullins bears the burden of proving that (1) the evidence is new and could not have been produced at trial with reasonable diligence, and (2) the evidence is of such materiality that there is a reasonable probability it would produce a different result upon retrial. *State v. Matson*, 260 Kan. 366, Syl. ¶ 6, 921 P.2d 790 (1996).

Mullins contends the prosecution had the obligation to obtain the medical reports for them at an earlier time. He also argues it

is unfair to require him to abandon this issue by consenting to go ahead with the trial after he was offered a continuance or a mistrial.

Mullins asserts the many examinations by Dr. Mills of B.M. without any statement as to physical or sexual abuse or a showing of such abuse in the examinations would have made the difference in the trial. Additionally, he contends Dr. Mills' testimony could have impeached A.R. concerning the time when allegations of sexual abuse were discovered.

The trial court properly found that Mullins has not met his burden of proving the evidence would have changed the result of the trial. The testimony of Dr. Lohrenz is sketchy and adds no support to the defense's contentions. In addition, the testimony of Dr. Mills, while relevant, would be cumulative to that of nurse Phillips who testified there were no signs of sexual or physical abuse. Dr. Mills' testimony might have been given greater weight than that of Phillips, but it is unclear that the outcome the trial would have been changed, because in essence, the decision of the jury was, in the final analysis, based upon whether the testimony of B.M. was believed.

There was substantial competent evidence which the trial court heard to justify its decision. The trial court's determination to deny the motion for new trial is not an abuse of discretion which this court will reverse on appeal.

Mullins also makes a *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), argument that the prosecution suppressed evidence favorable to the accused. The factual situation is to the contrary; as soon as the evidence was available to the prosecution, it was made available to Mullins. There is no *Brady* violation.

*The trial court did not commit reversible error in allowing Phillips to testify she saw no evidence that B.M. had been coached to tell his story.*

Mullins' contention is not that the trial court improperly allowed Phillips to testify as an expert witness under K.S.A. 60-456, but as to the extent of her expertise and in the answer of a single question, improperly gave an opinion as to the credibility of the alleged vic-

tim. Under these circumstances we held in *In re J.W.S.*, 250 Kan. 65, 71-72, 825 P.2d 125 (1992), that the standard of review is as follows:

"The admissibility of expert testimony lies within the sound discretion of the trial court and its determination will not be reversed absent a showing of abuse of discretion. [Citation omitted.]

. . . . .

"One who asserts an abuse of discretion bears the burden of showing such abuse. [Citations omitted.] Even if abuse of discretion is shown in a criminal case, the defendant has the burden of showing prejudice which requires reversal. [Citation omitted.]"

Phillips testified specifically as to her physical examinations of B.M., and she said she found no physical evidence of sexual abuse. She further testified concerning her separate interviews of both B.M. and his mother on two separate occasions. The line of questioning and the statement which gives rise to Mullins' objection occurred as follows:

"Q. [Mr. Cahill] Okay. Was there anything about that evaluation that caused you to be concerned that there might be coaching or that Brian in some way would be making this up? Anything inconsistent in his statements regarding that?

"MR. REARDON: Your Honor, could we approach?

"MR. REARDON: I object to this on the basis she can't be a human lie detector as to whether or not the child was telling the truth.

"MR. CAHILL: That's not what I am asking. Asking if anything led her to be concerned about the statements in that area that were inconsistent.

"THE COURT: I will allow it. Go ahead.

"Q. [Mr. Cahill] Go ahead and answer it.

"A. [Phillips] I thought he had been coached?

"Q. [Mr. Cahill] Right. Any indication of that kind of behavior?

"A. [Phillips] No."

The prosecution was also allowed to admit Phillips' written report which stated that "the child gave a history of sexual abuse that meets [the] criteria for a valid allegation." This was objected to on the basis that it contained a statement referring to Dr. Smith and because the written report constitutes hearsay. This was overruled by the trial court.

Mullins complains on appeal that the coaching question calls for a psychological evaluation of B.M. which Phillips was not qualified

to give. Mullins also argues the question itself was improper and allowing it to be answered constituted reversible error.

Mullins relies on *State v. Willis*, 256 Kan. 837, 888 P.2d 839 (1995), where we held that a licensed social worker was not qualified to diagnose medical and psychiatric conditions such as a rape trauma syndrome and post-traumatic stress disorder. Mullins additionally points to *State v. Jackson*, 239 Kan. 463, 470, 721 P.2d 232 (1986), where we held the trial court abused its discretion in allowing two social workers who possessed specialized training and experience in child abuse investigation to render their opinion that the victim was telling the truth.

The State contends this is a situation like *State v. Arrington*, 251 Kan. 747, 753, 840 P.2d 477 (1992). Both the victim and the defendant were mentally retarded. The expert witness was asked whether the victim "was distrustful or was being manipulative or deceitful in any way." 251 Kan. at 751. This was a close question, but under the facts of *Arrington*, we did not deem it to be an abuse of discretion to allow this question to be asked and answered.

Phillips' qualifications and experiences clearly show she possessed the education and background necessary to testify as an expert on the subject of child sexual abuse. The testimony given is not a psychological evaluation of B.M. The difficult question is whether asking if B.M. appeared to have been coached as to what to say was improper and, if it was, would it be considered to be harmless error or so egregious an error to require reversal and the granting of a new trial.

In *Arrington*, 251 Kan. at 752, we reviewed recent cases in this area in the following manner:

"[I]n *State v. Colwell*, 246 Kan. 382, 790 P.2d 430 (1990), . . . we stated:

'. . . Although an expert may give an opinion on an ultimate issue as provided in K.S.A. 60-456(d), such witness may do so only insofar as the witness aids the jury in the interpretation of technical facts or assists the jury in understanding the material in evidence. An expert witness may not pass on the weight or credibility of evidence, for those matters are strictly within the province of the jury. *State v. Moore*, 230 Kan. 495, Syl. ¶ 1, 639 P.2d 458 (1982).' 246 Kan. at 389."

We further summarized in *Arrington* the cases relied upon by Mullins herein. We stated:

" 'In *State v. Lash*, 237 Kan. 384, the defendant was accused of sexually molesting his fifteen-year-old son. A psychologist who interviewed the son gave expert testimony. He was asked his opinion, based on testing and interviewing the son, whether the son had been sexually molested by the father. Over defendant's objection, the court permitted the psychologist to testify as to whether he had an opinion whether the son had been sexually molested but would not permit the expert to testify as to whether the son had been sexually molested by the father. 237 Kan. at 384-85. The defendant was acquitted. The State appealed on a question reserved as to whether the trial court erred in not permitting the expert to testify that in his opinion the son had been sexually molested by the father. We affirmed the lower court's ruling, stating that the prosecutor's question was improper because it called for an opinion which would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. 237 Kan. at 386.

" 'In *State v. Jackson*, 239 Kan. 463, 721 P.2d 232 (1986), the trial court permitted two expert witnesses, social workers with expertise in child abuse treatment, to testify that "in their opinions the child was telling the truth and in their opinions the defendant committed the acts of molestation with which he was charged." 239 Kan. at 470. We reversed the conviction, stating that the experts attempted to serve as human lie detectors for the child and each told the jury that the child was truthful and the defendant was guilty as charged. We said, "We are convinced that it was the function of the jury to hear the testimony of the witnesses as to what the child said, and then to make a determination of the reliability of the child's statements." 239 Kan. at 470.' *Colwell*, 246 Kan. at 389-90." 251 Kan. at 752-53.

We additionally summarized in *Arrington* the case of *State v. Clements*, 241 Kan 77, 734 P.2d 1096 (1987), in the following manner:

" 'In *State v. Clements*, 241 Kan. 77, 734 P.2d 1096 (1987), defendant was accused of sodomizing an eleven-year-old child. Defendant denied any act of sodomy had taken place. A mental health therapist, with expertise with sexually abused victims, saw the victim in counselling seven times. Over defendant's objection, he testified that the boy's progress in therapy was consistent with what he would expect when a young boy was sodomized under such circumstances. 241 Kan. at 78-79. We found the testimony to be proper, reasoning:

"Although the complained-of testimony was close to the line of impermissibility, it does not cross the line. *The witness did not give an opinion as to whether or not P.V. [the victim] was telling the truth.*" ' *Colwell*, 246 Kan. at 390-91." 251 Kan. at 753.

Finally, we held in *Arrington*:

"In the present case, Ms. Inman was not asked and did not directly testify that in her opinion S. was telling the truth but merely testified that based upon her treatment of S. and considering his mental age and severe retardation, she did not think he was capable of being purposely deceitful. While the question may be a close one, we hold that when the testimony objected to is taken in its full context under the facts of this case, the trial court did not abuse its discretion in admitting the testimony." 251 Kan. at 753.

There are subtle and not so subtle distinctions in the manner in which the questions leading to a suggestion of truthfulness of the victim are asked. When the trial court overruled defense counsel's objection, Phillips rephrased the question, "I thought he had been coached?" and answered, "No." Technically, as prohibited by *Lash* and *Jackson*, the question asked of Phillips does not allow the giving of an opinion that B.M. had been sexually assaulted by Mullins or render an opinion that he was telling the truth. This does not, however, mean the question was proper, as it implies truthfulness.

*Arrington* is factually distinguishable from our case, although it is a decision supporting the State's argument that the question asked did not end up with the witness vouching for the truthfulness of the victim as to the ultimate facts.

In *State v. Clements*, 241 Kan. 77, 734 P.2d 1096 (1987), it was held that where the victim's therapist testified that the boy's progress in therapy was consistent with what he would expect of a young boy who had been sodomized, the testimony was deemed proper because the witness did not give an opinion as to whether the victim was telling the truth. A similarity between *Clements* and our case can be made.

In *State v. Smallwood*, 264 Kan. 69, 955 P.2d 1209 (1998), we found that expert testimony that a victim had died from child abuse was not improper because the expert was not testifying as to the ultimate question of the defendant's guilt or innocence. There, testimony that falling off a couch was one of the frequently heard standard excuses given in an instance of bringing an injured child to a hospital was improper, although it was harmless error.

In our case, the prosecutor knew the theory of the defense was that B.M. had been induced to bring the subject up and coached

in his testimony. As such, the question could have been interpreted by the jury to relate to the activity of the mother. If so interpreted, the question would not have been improper.

However, the question was directed to whether B.M. was coached, which is another way of asking if he was telling the truth. It is a close question, but we believe the line of inquiry to be improper, and the trial court erred in allowing the question to be answered.

This does not, however, require a new trial to be granted as we must determine if the harmless error rule applies. In discussing this rule in *State v. Sanders*, 258 Kan. 409, 418, 904 P.2d 951 (1995), Justice Lockett stated:

"The admission or exclusion of relevant evidence in a criminal case is governed by . . . the harmless error rule. . . . K.S.A. 60-261 sets out the harmless error rule. Error in the admission or exclusion of evidence by the court is not grounds for granting a new trial or setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. At every stage of the proceeding, the court must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. When reviewing the erroneous admission or exclusion of evidence, the error is harmless if no substantial right of the defendant is involved."

When we apply the directions of K.S.A. 60-261 to our determination, it is difficult to see how the answer to this single question examined in the light of all of the testimony and evidence introduced through 12 witnesses would constitute reversible error. We hold allowing this one answer is harmless error that does not cause prejudice to the substantial rights of Mullins so as to be inconsistent with substantial justice. See *State v. Clark*, 263 Kan. 370, 376, 949 P.2d 1099 (1997).

*The trial court erred in both of the sentences entered.*

We have defined an illegal sentence as one which does not conform to the statutory provisions of the convicted crimes, which must be reviewed when substantial questions are raised. *State v. Duke*, 263 Kan. 193, 194, 946 P.2d 1375 (1997).

Both the State and Mullins agree that the trial court erred and inadvertently assigned the sentence for count one to count two and the sentence for count two to count one. As we have stated, count

one was a charge of aggravated criminal sodomy and count two was a charge of aggravated indecent liberties with a child. During the sentencing hearing, the prosecutor stated that count one was committed after the adoption of the sentencing guidelines (July 1, 1993), while count two was committed prior the enactment of the guidelines. Despite this clear statement, the trial court sentenced Mullins to a pre-guidelines term of 15 years to life for count one (aggravated criminal sodomy) and assigned a post-guidelines term of 274 months for count two (aggravated indecent liberties with a child).

The State's contention that this is "a minor error that does not affect the amount of time the defendant would serve" and can be cured by a nunc pro tunc order reflects a misunderstanding of the necessity for legally correct sentences to be entered. Both sentences entered are in excess of the proper allowable sentences. We remand this case to the trial court for a proper sentencing of both counts.

In addition, Mullins properly argues and the State on appeal agrees that the result in this case is governed by our decision in *State v. Williams,* 250 Kan. 730, 736, 829 P.2d 892 (1992). Most of the evidence presented at trial showed the inappropriate touching of B.M. by Mullins occurred in late 1992 and early 1993. Prior to July 1, 1993, aggravated indecent liberties with a child only applied to "any guardian, proprietor or employee of any foster home, orphanage or other public or private institution for the care and custody of minor children." K.S.A. 21-3504 (Ensley 1988). We held in *Williams* that where the defendant is related to the victim, the only proper charge and conviction is aggravated incest and not indecent liberties with a child. We need not repeat what was said in *Williams* as it is clearly applicable to the facts in our case. Although the wording of K.S.A. 21-3504 (Ensley 1988) was amended by the 1992 Kansas Legislature in chapter 298, sec. 22 by deletion of the limiting wording, such amendment was not effective until July 1, 1993. A different result would be reached had Mullins committed the inappropriate touching subsequent to July 1, 1993, because of the legislative changes. However, the resentencing of count two must be for a 1992 conviction of aggravated incest. In

1992, aggravated incest was a class D felony, carrying a penalty of a minimum of 2 to 3 years and a maximum of 5 to 10 years and Mullins must be sentenced under these provisions.

This result is clearly also required by the wording of K.S.A. 21-4723 that if it cannot be determined whether a crime was committed on or after July 1, 1993, the person committing such crime shall be sentenced as if such crime had been committed prior to July 1, 1993. K.S.A. 21-4723 also reads that: "A crime is committed prior to July 1, 1993, if any of the essential elements of the crime as then defined occurred before July 1, 1993." This clearly occurred in this case. See *State v. Krumroy*, 22 Kan. App. 2d 794, 802, 923 P.2d 1044 (1996).

Mullins also correctly argues that the evidence as to B.M. being sodomized shows that offense occurred after July 1, 1993, and would be under the Kansas Sentencing Guidelines Act. The testimony was somewhat nonspecific except that it occurred soon after B.M.'s 8th birthday, which would have been on July 20, 1993. Additionally, it appears to have occurred around Halloween 1993 and in the winter of 1993-94.

We have held that where a jury verdict is nonspecific and uncertain as to whether an act was committed before or after the effective date of an amended statute, the defendant may be sentenced only to the lesser offense or sentence. *State v. Jackson*, 239 Kan. at 472. We are required to construe criminal charges strictly against the State. Under the facts of this case, the sentence for aggravated criminal sodomy must be deemed based on the charges and the facts shown to have occurred subsequent to July 1, 1993, but prior to July 1, 1994, making this a severity level 2 crime. With a criminal history category of B, this conviction may result in a guidelines sentence of 130, 137, or 144 months.

The conviction of aggravated criminal sodomy is affirmed. The conviction of aggravated indecent liberties with a child is restated pursuant to the rule of *State v. Williams* to be one of aggravated incest. The sentences for both convictions are vacated, and the case is remanded to the trial court for proper sentencing.