(111 P.3d 636)
No. 89,319
No. 89,320

STATE OF KANSAS, *Appellee,* v. LaVaughn E. Lewis, *Appellant.*

Opinion filed October 10, 2003.

*Jean K. Gilles Phillips*, of The Paul E. Wilson Defender Project, of Lawrence, for the appellant.

*Steven J. Obermeier*, assistant district attorney, *Paul J. Morrison*, district attorney, and *Phill Kline*, attorney general, for the appellee.

Before MALONE, P.J., PIERRON and GREEN, JJ.

PIERRON, J.: LaVaughn E. Lewis appeals from the district court's denials of his K.S.A. 60-1507 motion and his motion for new trial.

In February 1997, Lewis was charged with one count of aggravated indecent liberties with a child, in violation of K.S.A. 21-3504(a)(3). Lewis' arrest stemmed from a report made by his niece, C.C., on August 14, 1996, when she told police investigators that Lewis had touched her vaginal area while they were swimming together.

Michael D. Reed was appointed to represent Lewis in the criminal action. C.C.'s parents are Richard C. and Shelly K. C.C. has two older siblings, a sister, J.C., and a brother, R.C. When C.C. was 1 year old, Richard and Shelly divorced.

In 1994, Shelly and the three children resided with Shelly's family. Shelly did not act upon accusations lodged by the children that Calvin, Shelly's brother, was "messing with them." During a visit to the home of Patricia S., Richard's mother, the children said they were being sexually abused by Calvin. Patricia contacted the police. Calvin, who was 14 years old, admitted abusing the children, which included anal and vaginal intercourse and lewd fondling.

The children were removed from Shelly's care and placed with Patricia for approximately 3 months. During this time, Patricia took the children to receive counseling from Treeva Berber, a mental health therapist for families in sexual abuse treatment.

In August 1996, Richard was released from prison and went to live with Patricia, her husband, and Lewis, who is Patricia's son and Richard's brother. C.C., R.C. and J.C. visited Richard at the apartment where he lived with his family, also in August 1996. During the weekend visit, C.C., R.C. and J.C. went swimming with Lewis at the apartment complex swimming pool. At the end of the visit, they returned to their home with Shelly.

Approximately 1 day after the children's return, C.C. told Shelly that Lewis had touched her private area. Later, Shelly took the children to the police station. On August 14, 1996, Detective Hohnholt interviewed C.C. and R.C. C.C. told Hohnholt that Lewis touched her private area three times while she, R.C., and J.C. were in the pool with him. Although C.C. tried to distance herself from Lewis after the first touching, he touched her two additional times. R.C. told Hohnholt that while he was in the swimming pool, he went underwater and saw Lewis try to kiss C.C. and saw him rub C.C.'s vaginal area. Hohnholt videotaped both interviews.

Lewis was charged with aggravated indecent liberties with a child. When his trial commenced in October 1997, C.C. was 10 years old and resided with Shelly, J.C., and Shelly's boyfriend, Gary Shepherd. R.C., who was 12 years old, had moved from Shelly's home a few weeks after the police interview and lived with Richard and Patricia.

C.C. testified that Lewis had touched and rubbed her vaginal area three times while they were underwater in the pool. Although C.C. acknowledged that there were other people at the pool, she said that R.C. and J.C. were not underwater when Lewis touched her. She also stated that she went swimming with Lewis a second time after the incident and she did not tell Patricia that Lewis had touched her again. A letter written by C.C. as a part of her counseling, which explained how she felt about being sexually abused by Lewis, was also admitted into evidence.

Initially, R.C. testified that he overheard C.C. tell Shelly that Lewis had touched her on the private area. However, he also testified that he told police he had seen Lewis inappropriately touch C.C. because Shelly had told him if he did not say that she would have Shepherd beat him. R.C. said he had been physically abused often by Shepherd. R.C. then proceeded to testify that he did not see Lewis rub C.C.'s private area in the pool.

Detective Hohnholt testified regarding the details provided by C.C. and R.C. during her initial interview of both children. The videotaped interviews of C.C. and R.C. were shown to the jury. Hohnholt also stated that a few days prior to Lewis' trial, she had

spoken with R.C. again. At that time, R.C. told her that he had lied when making his earlier statement based on Shelly's instructions. R.C. said Shelly wanted to get revenge for something in the past. Hohnholt surmised that the past incident was the sexual abuse committed by Calvin.

Berber confirmed the events surrounding the children's earlier sexual abuse by Calvin. When C.C. disclosed the alleged abuse by Lewis, Shelly contacted Berber to schedule a counseling appointment for C.C. C.C. told Berber that Lewis inappropriately touched her and tried to kiss her in August 1996. Berber concluded that C.C. demonstrated behavior consistent with sustaining sexual abuse.

The defense called Jennifer Selby, R.C., Patricia, and Richard, all of whom were present during the weekend visitation. Selby, Lewis' girlfriend at the time of the incident, testified she never witnessed Lewis do anything inappropriate to any of the children on the one occasion when she accompanied them to the pool. Patricia testified that C.C. did not tell her that Lewis had touched her inappropriately. Patricia, Richard, and Selby testified the interaction between Lewis and C.C. remain unchanged throughout the visit.

Lewis testified that he went to the swimming pool with C.C., R.C., and J.C. on two occasions during the weekend visit, and that Selby accompanied them on the second day. He played "surfboard" with them, allowing the children to "surf" while standing on his back. Lewis stated that he did not touch C.C. inappropriately during the weekend visit.

The jury convicted Lewis of one count of aggravated indecent liberties with a child. Lewis filed a motion for judgment notwithstanding the verdict and a motion for new trial, both of which were denied. On April 10, 1998, Lewis was sentenced to 180 months.

On direct appeal to this court, Lewis argued the trial court erred by admitting an irrelevant and prejudicial letter written by C.C.; permitting Berber to testify about a specific instance of R.C.'s conduct which affected his credibility; and failing to deter the prosecutor from making improper remarks. Lewis' convictions were af-

firmed. See *State v. Lewis,* No. 81,475, unpublished opinion filed April 14, 2000, *rev. denied* 269 Kan. 938 (2000).

On September 21, 2001, Lewis filed a K.S.A. 60-1507 motion, contending he had been denied effective assistance of counsel because his trial attorney failed to investigate and call witnesses to the alleged incidents and failed to procure expert testimony regarding interviewing techniques and the suggestibility of children. Lewis also maintained he was entitled to a new trial based on C.C.'s recanted testimony. In a separate motion, also filed September 21, 2001, Lewis requested the court consolidate his 60-1507 motion and his motion for new trial and provide an evidentiary hearing. The court held a hearing on May 16, 2002, to address both motions.

At the hearing, Reed stated that he had been a trial lawyer for the Johnson County District Attorney's office for approximately 5 years, worked as a defense attorney in private practice, and served as a part-time prosecutor as well as a municipal court judge for the cities of Olathe and Overland Park. Reed was not able to recall details about the investigation or specific facts about the case, explaining that he had moved numerous times since the trial and was unable to locate his file.

Reed testified he had met frequently with both Lewis and Patricia to discuss defense strategies. They told him about other people at the pool at the time of the alleged incident, including family members. Reed determined that he would present the viewpoint of these family members through Lewis' testimony. Reed said he did not consult any experts regarding child interviewing techniques nor request an expert to assess the videotaped interviews of C.C. and R.C. because, although he had limited experience, he had read treatises suggesting that this issue pertained to younger children.

Reed testified regarding his trial strategy, noting that R.C. was considered to be the defense's "star witness." Reed interviewed R.C. several times in preparation for the trial and found him to be convincing and consistent. Reed recalled that R.C. would testify that he had not seen anything happen to C.C. and he had not seen C.C. leave the water or heard her tell Lewis to "quit." R.C.'s testimony was a mixed bag. He did testify that he heard C.C. tell Shelly that Lewis had touched her, apparently inappropriately. This

undoubtedly helped the State. However, R.C. also testified that he had been told to lie to Lewis' disadvantage which tended to bolster the defense's contention that the allegations were manufactured. Reed acknowledged that depending as much as he did on R.C.'s testimony was a mistake.

Lewis next called Dr. Robert Sanders, a psychologist who provides family and individual psychotherapy as well as couples counseling in both private and agency settings. He has been qualified on approximately seven occasions as an expert in child interviewing techniques.

Sanders explained that the method employed by a third party when interviewing a child is material because, often, the child will attempt to behave or respond in a manner believed to be in compliance with "adult business" and will deviate from his or her actual memories. Moreover, children who are members of a highly divided or conflict-ridden family are likely to perform in a way to please the adults to whom they are attached. Sanders opined that C.C. was still dependent on her family; thus, the "performance versus informant" problem needed to be addressed.

Sanders described an interviewing model, known as the Step-Wise interview technique. Using this technique, the interviewer is careful not to introduce suggestions of adult demand until the child has informed the interviewer about his or her life. Upon viewing the videotaped interview of C.C., Sanders opined that Hohnholt did not follow the Step-Wise interview technique. Sanders said the interview did not produce reliable and accurate disclosures by C.C. Based on the evidence presented by Berber regarding her interview of C.C., Sanders stated that Berber also did not interview C.C. in a manner prone to produce proper and dependable information.

Matthew O'Connor, an attorney licensed in Missouri and Colorado, testified next for Lewis. O'Connor has worked for the appellate defender's office in Columbia, Missouri, and as district defender for the Fifth Judicial Circuit in Missouri. Since 1996, he has been in private practice, primarily engaged in criminal defense work. Approximately 50 percent of O'Connor's clients are charged with sexual abuse violations. He has litigated or been involved with

10 to 20 cases related to sexual abuse on the appellate level and 50 to 100 cases on the trial level. O'Connor has also lectured on interview techniques and issues related to defending child sexual abuse allegations.

O'Connor testified that Reed's representation did not satisfy the standard for adequate representation in a sexual abuse case. He explained that, in preparation for a trial, he consults experts regarding forensic examination techniques for children. He may also procure an expert to evaluate any videotapes or victim statements. O'Connor felt that Reed failed in providing an expert to explain why C.C. made these allegations and why she may have been rewarded for continuing to say the same things. O'Connor also declared Reed's representation to be constitutionally deficient because Reed failed to interview available witnesses. O'Connor surmised that the result of Reed's failure to adequately represent Lewis resulted in prejudice that caused Lewis to be wrongly convicted.

In addition to cross-examining the foregoing witnesses, the State presented witnesses.

Helen Swan described her qualifications as a social worker, clinical specialist, as well as the intervention program director at the Sunflower House Child Advocacy Center. Swan supervises a forensic unit that interviews children who allege they have been sexually abused in Wyandotte and Johnson counties. She has provided training workshops on how to investigate, treat, and interview children who make allegations of sexual abuse for law enforcement, child protection agencies, prosecutors, and treatment therapists. Her qualifications have been described by the Kansas Supreme Court as follows:

"Swan is not a psychologist or psychiatrist. She is an international expert on the subject of child abuse. She is licensed as a clinical specialist in Kansas and has a master's degree in social work from the University of Kansas. She has had twelve years of experience in the area of mental health: the first seven with the Johnson County Mental Health Center, and the last five in private practice specializing in child abuse cases. She has worked with over 200 cases of abuse. She has qualified as an expert witness in sexual abuse cases in Nebraska, Missouri, and Oklahoma as well as Kansas." *State v. Reser,* 244 Kan. 306, 308, 767 P.2d 1277 (1989).

Swan testified that according to the studies regarding the suggestibility of children conducted by Gail Goodwin and by Ceci and Brunk, authors of Jeopardy in the Courtroom: A Scientific Analysis of Children's Testimony (2d ed. 1996), those children most susceptible are between the ages of 3 to 7. She stated that the ability toward suggestibility for children at age 10 is believed to be the same as an adult witness. C.C. was 2 months away from her 10th birthday when Hohnholt interviewed her.

From her vantage point of having personally conducted approximately 1,800 interviews and supervised or reviewed an additional 1,500 interviews, Swan viewed the videotape of C.C.'s interview by Hohnholt. Swan concluded that the investigating techniques employed by Hohnholt conformed to the norms and protocols deemed acceptable to herself and her colleagues both in 1996 and at the time of the hearing.

Brenda Cameron served as the prosecutor at Lewis' trial. Cameron's 12 years of legal experience had been gained solely in the area of criminal law. During a portion of that time, she was head of the child sexual abuse unit at the Johnson County District Attorney's office.

At the time of the hearing, Cameron was doing criminal defense work. She stated that she had been involved with several child sexual abuse jury trials as a defense attorney and approximately five child sexual abuse jury trials as a prosecutor. Cameron stated that C.C.'s story remained consistent and C.C. never indicated that she had fabricated the story. Further, C.C. had at least three opportunities, coming into contact with personnel from the district attorney's office, to recant her story of sexual abuse.

Cameron described Reed as a very competent and aggressive attorney. She recalled that Reed was a zealous advocate throughout, even challenging each of Lewis' prior convictions in order to reduce his criminal history score from A to B, which Reed was able to do.

After describing her experience as the prosecutor in Lewis' case, Cameron was allowed to testify regarding her experience as a defense attorney in child sex abuse cases. Cameron attested that, in

defending child sex abuse cases, she has never consulted an expert to testify about interviewing techniques of children.

Scott Toth has been a prosecutor for approximately 14 years in the Johnson County District Attorney's office, primarily prosecuting child sexual abuse cases. He was then the section chief of the child sexual abuse unit. Toth estimated he had prosecuted hundreds of child sex cases. He has been involved with approximately 25 child sexual abuse jury trials, the majority of which involved victim witnesses under the age of 10 years. Toth testified he could not recall a case where the defense attorney called an expert witness to testify regarding the suggestibility of interviewing techniques of child victims of sexual abuse. Toth could not even recall court-appointed defense counsel making a request to retain an expert on the suggestibility of child victim witnesses in any of the cases with which he had been associated.

In support of his claim that Reed was also ineffective for failing to call additional witnesses, Lewis testified that he provided Reed with the following list of witnesses to the alleged incident at the beginning of Reed's representation: Anita West, LaTonia Wesley, Rita West, T.W., J.C., Selby, and A.C. He also described for Reed another couple, whose names he did not know, as possible witnesses. J.C., Rita West, Anita West, and T.W. testified at the evidentiary hearing regarding their observations of the alleged incident.

Before the evidentiary hearing on Lewis' motions, C.C. wrote a letter stating that her mother and the district attorney directed her how to testify at the trial and that she had falsely testified. At the hearing, C.C. testified she was never alone with Lewis at the pool and that he did not touch her in a sexual manner at any time during that day. Under cross-examination, C.C. stated Lewis had touched her while she was in the swimming pool, but that she believed it was accidental because she was ready to fall off of Lewis' back. C.C. also told the court that she currently lived with Patricia, because Shelly's boyfriend was abusive.

Elicia Jones, Lewis' sister, briefly testified that she spoke with C.C. about the alleged incident when C.C. was visiting her home. Jones asked C.C., "Did this really happen?" C.C. responded, "No."

The district court found that Reed's decision not to call additional lay witnesses did not fall below the required standard for effective assistance of counsel. Regarding Lewis' claim that the failure to consult or call an expert to testify regarding the suggestibility of a child witness, the court discerned that the question of whether an expert would have been allowed to testify regarding this issue "is not settled." The court also denied Lewis' motion for a new trial, determining that C.C. did not actually recant her testimony.

Lewis filed a lengthy motion asking the district court to reconsider both of its decisions. The court denied Lewis' motion to reconsider its denial of his 60-1507 motion and reaffirmed its decision not to grant Lewis' motion for a new trial. Lewis appealed both decisions, as well as the district court's denial of his motions to reconsider. This court consolidated the issues related to Lewis' 60-1507 motion and his motion for new trial for purposes of argument and decision.

To determine whether counsel's assistance was so defective as to call for reversal of a conviction, Lewis is required to establish that: "(1) counsel's performance was deficient, which means counsel made errors so serious that counsel's performance was less than that guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which requires showing counsel's errors were so serious they deprived defendant of a fair trial." *State v. Hedges,* 269 Kan. 895, 913, 8 P.3d 1259 (2000).

The performance and prejudice prongs of the ineffective assistance of counsel inquiry are mixed questions of law and fact on appeal requiring de novo review. *State v. Sperry,* 267 Kan. 287, 297, 978 P.2d 933 (1999). Thus, "where the trial court has made findings of fact and conclusions of law, [an appellate court determines] whether the decision reached by the trial court follows as a matter of law from the facts stated as its basis, and also whether the facts so stated have substantial support in the evidence. [Citation omitted.]" *State v. Orr,* 262 Kan. 312, 322, 940 P.2d 42 (1997).

"Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. There is a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance. [Citation omitted.] To show prejudice, the defendant must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. [Citation omitted.]" *State v. Betts,* 272 Kan. 369, 387-88, 33 P.3d 575 (2001).

We first deal with the issue of whether trial counsel was ineffective in failing to consult or procure an expert on the subject of techniques employed in interviewing a child sex crime victim.

When a defendant accepts counsel, the conduct of the case rests with the attorney. After consultation with the client, it is within the province of the lawyer to decide what witnesses to call, whether and how to conduct cross-examination, and other strategic and tactical decisions. *State v. Ward,* 227 Kan. 663, Syl. ¶ 1, 608 P.2d 1351 (1980). However, "when counsel lacks the information to make an informed decision due to inadequacies of his or her investigation, any argument of 'trial strategy' is inappropriate. [Citations omitted.]" *Mullins v. State,* 30 Kan. App. 2d 711, 716-17, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002).

Lewis contends Reed's failure to investigate the possibility of utilizing an expert to challenge the validity of C.C.'s allegations of sexual abuse and to explain how the allegations may have been false was objectively unreasonable. Lewis posits that such use of an expert was critical to his defense because C.C.'s allegations were ambiguous and, as Reed acknowledged, her home life was beset with conflict between Shelly's and Richard's families.

After setting forth specific findings of fact, the district court ruled that Reed's failure to consult or call an expert did not deprive Lewis of effective assistance of counsel, as the question of "[w]hether such an expert would be allowed to testify is not settled." Because the district court held an evidentiary hearing on Lewis' motion, filed pursuant to K.S.A. 60-1507, "[t]he standard of review . . . is for the appellate court to determine whether the factual findings of the court are supported by substantial competent evidence and whether those findings are sufficient to support its conclusions of law. [Citation omitted.]" *Lumley v. State,* 29 Kan.

App. 2d 911, 913, 34 P.3d 467 (2001), *rev. denied* 273 Kan. 1036 (2002).

The State argues that the district court's statement regarding the admissibility of expert testimony on the subject of the suggestibility of children was supported by our Court of Appeals' decision, *State v. Trujillo*, No. 83,332, unpublished opinion filed July 7, 2000.

Trujillo was charged with aggravated indecent liberties with his 8-year-old granddaughter. There was no conclusive medical evidence supporting the victim's sexual molestation. The victim was interviewed by a KBI agent and a worker from SRS. At trial, Trujillo attempted to offer the testimony of Sanders, the same expert presented by Lewis. The district court did not admit Sanders' testimony, finding that his proffered expert testimony "was not beyond the knowledge of the jury." Additionally, the court found that Trujillo had failed to establish the existence of a generally accepted interview technique to be used when interviewing children; thus, Sanders' proffered testimony did not meet the *Frye* test. See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

The *Trujillo* court reviewed the required elements for admitting expert testimony: it must aid the jury and the basis of the scientific opinion must be shown to be generally accepted as reliable within the expert's field. *Trujillo,* Slip op. at 3 (citing *State v. Miller*, 240 Kan. 733, 736-37, 732 P.2d 756 [1987]). As always, the admissibility of expert testimony remains within the trial court's discretion. *State v. Graham,* 246 Kan. 78, 81, 785 P.2d 983 (1990).

On appeal, this court determined the district court did not abuse its discretion in denying admission of Sanders' testimony. This court agreed there was no testimony that the seven-step process for properly conducting interviews with children, presented by Sanders, was generally accepted as the preferred method of interviewing children; thus, the *Frye* test had not been satisfied. *Trujillo,* Slip op. at 4-5.

Notably, Judge Bennett was a member of the panel deciding *Trujillo* and wrote a dissent. While he concurred that an expert cannot be allowed to comment on the truthfulness or weight of the testimony given by the child witness, Judge Bennett opined that the district court should have allowed Sanders' testimony "for the

limited purpose of rebutting the testimony of the State's witnesses concerning the appropriateness of their interview techniques and the effect such techniques could have. By totally prohibiting the expert testimony, the jury was left with only the State's witnesses vouching for their interview methods." *Trujillo*, Slip op. at D-1 (Bennett, J., dissenting).

Lewis argues the State did not properly preserve the issue of whether expert testimony would be admissible on this topic by failing to object to its admission at the district court level. See K.S.A. 60-404; *State v. Diggs*, 272 Kan. 349, 365, 34 P.3d 63 (2001). Further, he contends that Kansas appellate courts are following the trend toward admitting of expert testimony on child interviewing techniques. In support, Lewis points to another unpublished Court of Appeals' opinion, *State v. Kastl*, No. 83,785, unpublished opinion filed August 11, 2000.

Kastl was convicted of aggravated indecent liberties with a 4-year-old child. On direct appeal, Kastl contended he had been prejudiced by the trial court's decision to exclude testimony by his expert, Dr. Monty Weinstein, a psychologist and family therapist who had experience working with abused children. Weinstein had testified in 40 states regarding the susceptibility of children to suggestion. In Weinstein's proffer, he informed the court that children could be influenced to answer questions in a certain way, particularly if they were repeatedly questioned about the event.

While noting that "[t]here is no question an expert witness is not allowed to testify regarding the credibility of a child in a sexual abuse case," the *Kastl* court pointedly wrote: "Kansas has not addressed the admissibility of general testimony regarding the susceptibility of children to suggestion." *Kastl*, Slip op. at 7 (citing *State v. Jackson*, 239 Kan. 463, 721 P.2d 232 [1986]). Further, the *Kastl* court opined:

"While the authorities are split, there is a trend toward allowing such evidence if a qualified expert can assist the jury in evaluating whether improper investigative techniques were employed during interviews with child victims. Accordingly, experts should be allowed to assist the jury by explaining the effect of coercive or suggestive techniques, but not to offer opinions as to the issue of credibility." *Kastl*, Slip op. at 8-9.

Nevertheless, due to a number of additional factors, the *Kastl* court found that the defendant was not prejudiced by the trial court's refusal to admit Weinstein's testimony. *Kastl*, Slip op. at 9-10.

Lewis also points to numerous decisions from additional jurisdictions as well as "a plethora of information about the literature and the acknowledgment of the usefulness of experts regarding child interviewing techniques." The State cites a number of cases from other jurisdictions where the expert testimony was inadmissible. Research had revealed a rather recent compilation of cases from jurisdictions which admit the expert testimony and those which deem it inadmissible. See Annot., 87 A.L.R. 5th 693.

In support of his contention that Kansas is following the trend toward admitting expert testimony on this topic, Lewis directs the court's attention to the recent decision of *State v. McIntosh*, 274 Kan. 939, 58 P.3d 716 (2002). McIntosh complained he had been prejudiced by the trial court's admission of testimony by a licensed clinical social worker that the victim exhibited behavioral patterns consistent with a child who had been sexually abused. On review from the Court of Appeals, the Supreme Court affirmed this court's opinion that expert testimony concerning common patterns of the behavior of sexually abused children is admissible to corroborate the complaining witness' allegations. 274 Kan. at 958-60. Lewis maintains *McIntosh* indicates that a court would also admit testimony concerning how a complaining witness could demonstrate such behavior even if the allegations made were false.

Notably, the *Trujillo* and *Kastl* opinions, filed within 1 month of each other, support the district court's conclusion that Kansas law was "unsettled" in this area. However, Lewis contends this court's decision in *Mullins v. State*, 30 Kan. App. 2d 771, indicates the district court's statement is flawed and demonstrates that the use of an expert was a crucial tool in defending child sexual abuse cases which was widely recognized at the time of Lewis' trial. *Mullins* was a 60-1507 case in which this court found that trial counsel was ineffective for failing to consider hiring an expert, either for use at trial or for use in preparation of cross-examination of the State's

witnesses, and for abandoning all inquiry into interview techniques. 30 Kan. App. at 717-18.

Mullins was accused of sodomizing his son. There were no visual signs of sexual abuse and no witnesses to the alleged offenses. See *State v. Mullins*, 267 Kan. 84, 977 P.2d 931 (1999). Mullins was convicted primarily based on the testimony of the victim, just as Lewis was in this case. Pat Phillips of the KU Medical Center testified regarding the victim's normal medical exam. Phillips informed the jury that "physical indications of anal penetration were not present in 60 to 80 percent of the children sodomized," and Phillips also testified that "there were no signs that [the victim] had been 'coached.'" 267 Kan. at 88.

At the 60-1507 hearing, Mullins called the same two expert witnesses as Lewis, O'Connor and Sanders, and his trial counsel. The State called no witnesses and only minimally cross-examined Mullins' witnesses.

O'Connor opined that it was "common knowledge" to use an expert in this type of case. O'Connor testified that Mullins' trial counsel should have obtained an expert in order to adequately challenge the State's experts, including Phillips, and to challenge the interview techniques employed by the State investigators.

Sanders assessed the three interviews conducted with the victim. In addition to criticizing the techniques used in two of the interviews, Sanders also noted serious flaws in the study relied on by Phillips and discredited her trial testimony. Our Court of Appeals noted that trial counsel was aware of Phillips' report "some 15 months prior to trial" yet had not reviewed the study or was prepared to rebut it. *Mullins*, 30 Kan. App. 2d at 715.

Considering the foregoing, this court stated:

"We must conclude trial counsel's performance was deficient. The trial court concluded the art of defending child sexual abuse cases had 'evolved' and that while counsel perhaps should have attempted to secure an expert, 'few attorneys would have done so at the time.'

"Simply put, this finding of fact is without any support in the record. O'Connor testified to the exact opposite—that the use of experts in this type of case was crucial and that fact was well known *at the time of Mullins'* criminal trial. That testimony stands uncontroverted. Trial courts cannot disregard uncontroverted

testimony unless it is shown to be untrustworthy. See *In re Adoption of W.J.*, 262 Kan. 788, 795, 942 P.2d 37 (1997)." *Mullins*, 30 Kan. App. 2d at 717.

As the court further explained, the State's failure to present any testimony or evidence to the contrary of that produced by Mullins played a substantial role in its determination:

"In the present case, we must conclude the adversarial process was so broken down by the failure of trial counsel to consult and/or procure an expert witness that we are compelled to hold the trial court erred in denying Mullins' 1507 motion. We are compelled, primarily, on the essentially uncontroverted record at the 1507 hearing. For whatever reason, the State presented no evidence, no witnesses, and did little cross-examination of Mullins' witnesses to provide the trial court any support for determining Mullins' trial counsel was effective. See *Cellier v. State*, 28 Kan. App. 2d 508, 523, 18 P.3d 259, *rev. denied* 271 Kan. 1035 (2001)." *Mullins*, 30 Kan. App. 2d at 718.

*Mullins* shares some striking similarities with Lewis' case; nonetheless, as the district court found, it is distinguishable. At Lewis' evidentiary hearing, the State called two attorneys, both of whom had prosecuted cases of child sexual abuse in the jurisdiction where Lewis' case was tried. Both testified they were unaccustomed to the defense attempting to present expert testimony concerning the suggestibility of children. Although Lewis contends the attorneys testifying for the State had a "vested interest in the outcome," both testified under oath that they had not encountered the use of expert testimony on the suggestibility of child victim witnesses even though the number of trials between them concerning child sexual abuse numbered at least in the teens.

Additionally, the State countered Sanders' testimony concerning the interviewing techniques utilized by the police investigators. Testifying for the State, Swan attested that the interviewing techniques used in interviewing C.C. were within accepted protocol. Swan's testimony suggests that Reed's failure to consult an expert or procure expert testimony did not result in constitutionally deficient representation.

The State also did not emphasize the correctness of the interviewing techniques used by the police investigators, nor did an expert, testifying for the State, comment on C.C.'s credibility. See *Mullins*, 267 Kan. at 88, 92-94. As well, the investigator did not

testify regarding the appropriateness of the interviewing techniques. See *Trujillo,* Slip op. at 5, dissent at D-1. Thus, the jury was not instructed by either party how to view the interviewing techniques.

Both children testified and were subject to cross-examination before the jury. The jury was able to personally gauge their credibility and to compare how they responded to questions at the initial interview and to those at trial.

The defense elicited testimony setting forth a basis from which the jury could discern that C.C. may have been motivated by her mother to make false allegations. Information regarding C.C.'s earlier sexual abuse by Calvin, culminating in C.C.'s removal from Shelly's home and her placement with Patricia, was presented through R.C., C.C., Patricia, and Shelly. Additionally, R.C. testified that his mother told him to lie and Detective Hohnholt described her follow-up interview with R.C., when R.C. told her he had lied earlier because his mother wanted revenge.

*Mullins* was not the same as the instant case. We also note the State's defense of Mullins' 60-1507 motion was weak and left a paltry record in support of its position, whereas the defense presented by the State here was formidable. We find, based on the state of law at that time, Reed was not ineffective for not consulting with an expert regarding child interviewing techniques in this case.

The next issue is whether trial counsel's failure to call additional witnesses to the alleged incident constitutes ineffective representation.

The decision of whether to call a certain witness is a matter of trial strategy. See *Winter v. State,* 210 Kan. 597, Syl. ¶ 2, 502 P.2d 733 (1972). See also *United States v. Long,* 674 F.2d 848, 855 (11th Cir. 1982) (an appellate court does not "second-guess" tactical decisions made by counsel in determining whether to call certain witnesses). Defense counsel has the duty to reasonably investigate or to reasonably conclude that particular investigations are unnecessary. A decision not to investigate must be considered under the prevailing circumstances, granting a heavy measure of deference to counsel's judgments. *State v. Hedges,* 269 Kan. 895, 914, 8 P.3d 1259 (2000). Notably, defense counsel cannot cursorily decide not

to investigate before obtaining necessary facts. *Kenley v. Armontrout,* 937 F.2d 1298, 1308 (8th Cir.), *cert. denied Delo v. Kenley,* 502 U.S. 964 (1991).

Lewis maintains Reed did not conduct a reasonable investigation because he failed to contact or interview six eyewitnesses, all of whom would have testified that they did not see Lewis inappropriately touch C.C. or act any differently after the alleged abuse. The eyewitnesses listed by Lewis in his 60-1507 motion were: J.C., A.C., T.W., Anita West, Rita West, and LaTonia Wesley. Of those six, four testified at the evidentiary hearing.

J.C., who was 19 years old at the time of the hearing and C.C.'s older sister, said she was swimming with C.C., R.C., and Lewis at the time of the alleged incident and that C.C. and Lewis were never alone together in the pool. According to J.C., C.C. did not act any differently toward Lewis after they went swimming. J.C. attested that, had she been interviewed by the police, the district attorney, or by Reed, she would have said, "Nothing happened."

At Lewis' trial, Reed ascertained that J.C. had been taken to the police station when C.C. and R.C. were initially interviewed; however, J.C. was not interviewed by authorities. During closing remarks, Reed repeated to the jury that the State had failed to introduce J.C. as a witness. Reed also told the jury the reason he did not talk to J.C. was "[b]ecause she's living with mom and I don't get access to her." Reed's comment is bolstered by J.C.'s testimony at the evidentiary hearing, where she testified that she did not come forward with her account earlier because Shelly would not allow her to. She was also afraid that Shelly's boyfriend would beat her if she called anyone to tell them what happened. For the past several years, J.C. had been living with Patricia.

Next, Lewis called Rita West. Lewis is the father of Rita's nephew. Rita was not at the pool; however, she said she could view the pool from where she was seated in her car at the top of a hill. She did not see Lewis and C.C. in the pool together. Had Rita been contacted by Reed, she would have told him that C.C. and Lewis both "acted normal."

T.W., C.C.'s 14-year-old cousin, testified she was at the pool on the day of the alleged incident. She said that Lewis and C.C. were

never alone together in the pool and that she did not witness Lewis touch C.C. inappropriately. Additionally, C.C. did not act any differently after they left the pool.

Anita Karen West, the mother of Lewis' son, stated she had stopped by the pool briefly. She also did not see anything occur that day. Anita said she, Patricia, LaTonia, and A.C. went to Reed's office before the trial. Although she spoke with Reed, he told her that he did not need her to testify.

The district court determined Reed made a "conscious decision of who to call for trial testimony." See *Johnson v. Lockhart*, 921 F.2d 796, 799 (8th Cir. 1990), *reh. denied* (1991) ("Once an attorney interviews a witness, it becomes largely a matter of legal judgment as to whether the witness should be called to testify.") Based on the testimony provided, the court further found that Reed was made aware of the witnesses listed in the motion. In support of this conclusion, the court noted that Anita testified that she, Patricia, A.C., and LaTonia went to Reed's office prior to Lewis' trial.

While defense counsel is considered ineffective for failing to call a witness when a witness would present the only defense available, it is not ineffective assistance of counsel to fail to call a witness whose testimony would only have been cumulative in nature. *United States v. Miller*, 643 F.2d 713, 714 (10th Cir. 1981). Here, Patricia and Selby both testified at Lewis' trial that they did not see Lewis do anything and that C.C. did not tell them anything. Richard, C.C.'s father, corroborated the women's testimony that C.C. did not act any differently toward Lewis during the visit. The testimonies of T.W., Rita, and Anita essentially stated the same at the evidentiary hearing.

Additionally, although Lewis testified at the 60-1507 hearing that he only took C.C. swimming on one occasion, at trial Lewis testified that he took C.C. and her siblings swimming twice. Both R.C. and Patricia also testified at the trial that the children went swimming on two occasions with Lewis. Thus, it is unclear which day any of the eyewitnesses were present or if they were even present at the pool when the alleged sexual abuse occurred.

Finally, "[m]uch deference and reliance must be placed upon the wisdom and determination of the trial judge who saw all of the

proceedings first hand as they happened." *Chamberlain v. State,* 236 Kan. 650, 659-60, 694 P.2d 468 (1985). Here, the judge who presided at the trial and heard posttrial motions also presided at the evidentiary hearing. The judge surmised that nothing at the trial had alerted him that Lewis might have been receiving ineffective assistance. The court did not cursorily dismiss Lewis' motions but, rather, granted a full evidentiary hearing. Additionally, the court reviewed the trial transcript, determining that Reed was an "active advocate at the trial."

There is no reason to consider if the cumulative effect of the trial counsel's errors resulted in Lewis being deprived of effective assistance of counsel when it appears that substantial competent evidence supports the district court's determination that Reed's representation was not objectively unreasonable. Under the second prong of the test for ineffective assistance of counsel, the defendant is required to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Chamberlain,* 236 Kan. at 657. Finding that Reed acted reasonably in not presenting additional witnesses or in not consulting or presenting expert testimony regarding interviewing techniques of child sexual abuse victims, the 60-1507 judge did not reach the second prong of the test for ineffective assistance of counsel. See *Lumley v. State,* 29 Kan. App. 2d 911, 914, 34 P.3d 467 (2001), *rev. denied* 273 Kan. 1036 (2002) (no need for court to address second prong if defendant fails to prove first).

Lewis' next argument is that the district court erred in denying his motion for a new trial based on C.C.'s written and oral statements recanting her trial testimony. " '[A]ppellate review of a trial court's decision denying a new trial is limited to whether the trial court abused its discretion.' [Citations omitted.]" *State v. Kirby,* 272 Kan. 1170, 1192, 39 P.3d 1 (2002). Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. *State v. Lopez,* 271 Kan. 119, 125, 22 P.3d 1040 (2001).

A two-part test is employed to determine whether a new trial is warranted based on newly discovered evidence. First, the defend-

ant must establish that the newly proffered evidence could not have been produced at trial with reasonable diligence. Second, the evidence must be of such materiality that a reasonable probability exists it would produce a different result upon retrial. *State v. Betts*, 272 Kan. 369, 380, 33 P.3d 575 (2001). Neither party argues that C.C.'s recanted testimony was not newly discovered evidence as C.C.'s initial written assertion that Lewis had not touched her was dated August 2000, nearly 3 years after Lewis was sentenced. Moreover, as C.C. testified that no one saw Lewis touch her inappropriately, seemingly her allegations that Lewis rubbed her vaginal area three times became the primary basis on which the jury found Lewis guilty of aggravated indecent liberties with a child.

The following exchange occurred between the district court and C.C. at the evidentiary hearing:

"COURT: Let me ask this. As I understand—I want to make sure that I understand what you are saying today. Are you saying that you told your mother when you got back to her house about the touching but that you don't think that it was meant in a bad way?

"Witness [C.C.]: Uh-huh.

"COURT: Is that what you are saying?

"[C.C.]: Uh-huh.

"COURT: You are not saying that you didn't tell your mother about the touching?

"[C.C.]: I told her, but I told her that I didn't think that it was in a bad way.

"COURT: Then they told you that they wanted you to say it was in a bad way?

"[C.C.]: Uh-huh.

"COURT: Is that what you are saying?

"[C.C.]: Uh-huh.

"COURT: Okay."

The district court refused to grant Lewis' motion for a new trial, finding that C.C had failed to recant her testimony. The court concluded "that while the victim wants to change her testimony she has failed to change it in a way that would produce a different result because she still maintains that what she told her mother happened in the pool did indeed happen."

In his motion to reconsider, and on appeal, Lewis maintains that C.C.'s testimony did materially change. At trial, C.C. said that Lewis had rubbed her private area three times, while at the evidentiary hearing she characterized Lewis' touching as accidental.

Lewis contends the relevant issue is not whether C.C. stated he touched her; rather, whether he touched her in a sexual manner.

In his ruling, the district court ascertained that prior to the evidentiary hearing, C.C. wrote a letter stating that Lewis "never touched" her. She also signed an affidavit before the evidentiary hearing attesting that Lewis did not "touch [her] inappropriately." In both attestations, C.C. said that Shelly had told her to lie.

At the evidentiary hearing, in response to the question, "Did [Lewis] ever touch you in a sexual manner at any time during that day?" C.C. responded, "No." She stated the reason she had said earlier that Lewis touched her sexually was "[b]ecause they told me to."

C.C. testified she was no longer living with her mother, Shelly, because her mother's boyfriend is abusive. She had been living with Patricia for approximately 1 year. Under cross-examination, C.C. said she did not remember being interviewed by the police or telling Berber that Lewis touched her while swimming in the pool. C.C. explained that her therapist, Berber, told her what to write in the letter which was admitted at trial expressing C.C.'s feelings about Lewis' abuse. She did not recall meeting with the prosecutors before trial. However, C.C. stated she did recall testifying at Lewis' trial.

"New trials on grounds of newly discovered evidence are not favored, and such motions are to be viewed with caution. [Citation omitted.]" *State v. McKinney*, 272 Kan. 331, 338, 33 P.3d 234 (2001). Where the recanted testimony of a prosecution witness forms the basis of a motion for new trial, the trial court determines the weight to be accorded to such testimony. 272 Kan. at 338. Although a conviction based on perjured testimony is a violation of due process, *State v. Brewer*, 11 Kan. App. 2d 655, 660, 732 P.2d 780, *rev. denied* 241 Kan. 839 (1987), recantation by a prosecution witness is looked upon with great suspicion. *State v. Norman*, 232 Kan. 102, 109, 652 P.2d 683 (1982).

The credibility of the evidence offered in support of a motion for a new trial belongs to the trial court. A trial court's finding after an evidentiary hearing, if supported by substantial competent evidence, will not be disturbed on appeal. See *State v. Mullins*, 267

Kan. 84, 89, 977 P.2d 931 (1999). Here, the district court had ample evidence showing C.C.'s recantation may have originated from her sense of loyalty to her grandmother, Patricia, with whom she was currently residing. Although C.C. wrote in one statement that Lewis never touched her, she informed the court that she told her mother that Lewis had touched her, but not that Lewis had touched her in a sexual manner. In addition to claiming that her mother told her to lie, C.C. also alleges the prosecution told her to lie. The prosecutor testified to the contrary, putting forth three occasions when C.C. had the opportunity to recant before trial. Seemingly, there was substantial competent evidence to justify the trial court's decision; the trial court did not abuse its discretion denying Lewis' motion for a new trial.

Finally, Lewis argues that trial counsel committed two errors, compounded by the victim's recantation. Considered cumulatively, Lewis contends the prejudicial impact mandates reversal.

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' [Citation omitted.]" *State v. Plaskett,* 271 Kan. 995, 1022, 27 P.3d 890 (2001).

The errors cited by Lewis are those previously addressed. Although the evidence against Lewis was not overwhelming, the jury was presented with substantial testimony that Lewis had inappropriately touched C.C. It was the jury's responsibility to sort out the credibility of the testimony and render a verdict. See *State v. Moore,* 269 Kan. 27, 30, 4 P.3d 1141 (2000). Although the victim has now recanted her testimony, it appears the trial court did not abuse its discretion in determining that her recantation did not merit a new trial.

Affirmed.