NOT DESIGNATED FOR PUBLICATION

No. 124,434

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SCOTT ROBERT BOLLIG,
*Appellant.*

MEMORANDUM OPINION

Appeal from Trego District Court; GLENN R. BRAUN, judge. Opinion filed January 20, 2023.
Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before HURST, P.J., HILL and ATCHESON, JJ.

ATCHESON, J.: This is the fourth trip to our court for Defendant Scott Robert Bollig in his direct appeal of a jury verdict finding him guilty of conspiracy to commit murder for plotting to end his then-girlfriend's pregnancy against her wishes. In the most recent appearance, we remanded to the Trego County District Court to hold an evidentiary hearing on Bollig's motion for a new trial in light of the former WaKeeney police chief's admission he committed perjury while testifying as a State's witness. The district court had denied the motion without a hearing, thereby precluding Bollig from exploring the full extent of the perjurious testimony. The district court has now held an evidentiary hearing—at which the former police chief did not appear—and reiterated its

1

ruling denying Bollig's request for a new trial. Given the evidentiary record, we find no error in the district court's decision and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In a trial in November 2015, a jury found Bollig guilty of conspiring to commit intentional first-degree murder as a principal in a plot to terminate his then-girlfriend's pregnancy by secretly feeding her Mifepristone and Misoprostol, drugs commonly used together in medication abortions. The district court later sentenced Bollig to serve 117 months in prison followed by 36 months of postrelease supervision. As far as we are aware, Bollig remains in prison.

Bollig timely appealed the conviction. We assume the reader's familiarity with the detailed factual and procedural history of the prosecution set out in our earlier opinions. *State v. Bollig*, No. 115,408, 2018 WL 1976689 (Kan. App. 2018) (unpublished opinion) (*Bollig I*) (affirming in all respects except district court's ruling on motion to suppress and remanding for additional findings and conclusions on that issue); *State v. Bollig*, No. 115,408, 2018 WL 3945934 (Kan. App. 2018) (unpublished opinion) (*Bollig II*) (affirming district court's denial of motion to suppress based on augmented findings and conclusions); *State v. Bollig*, No. 120,398, 2020 WL 3566537 (Kan. App. 2020) (unpublished opinion as modified) (*Bollig III*) (remanding to district court to hold evidentiary hearing on motion for new trial).

In summary, Bollig conspired with a nurse, with whom he had a romantic involvement, about the best way to end his girlfriend's pregnancy after she told him she intended to have the child. The primary evidence of the conspiracy consisted of text messages between Bollig and the nurse taken from his smartphone. During questioning at the WaKeeney police station, Bollig allowed WaKeeney Police Chief Terry Eberle and

2

Kevin Campbell, an agent with the Kansas Bureau of Investigation, to retain the smartphone after they displayed a search warrant permitting them to seize it. Bollig also signed consent forms allowing investigators to examine the information stored in the phone and on his personal computer. In a suppression hearing, Bollig testified he signed the forms only because the officers assured him he could get his phone back the next day and nothing bad would happen to him if he cooperated. Both Eberle and Campbell testified without much elaboration that they made no threats or promises to Bollig during their questioning of him. The district court denied the motion to suppress, finding the officers to be credible and Bollig not.

At trial, Eberle testified that during a second meeting, at which Campbell was also present, Bollig admitted crushing up a Mifepristone pill and putting it in pancakes he prepared for his girlfriend. She ate most of the pancakes and miscarried several days later. During her trial testimony, the woman told the jury Bollig admitted slipping the drug to her into the pancakes. Bollig denied making any such statements and told the jury his girlfriend voluntarily took the drug. Campbell testified only briefly and did not discuss any interactions with Bollig. In short, Eberle offered significant testimony in both the pretrial proceedings and at trial.

In May 2017, the Trego County Attorney charged Eberle with multiple felonies at least some of which entailed malfeasance as police chief. About four months later, the county attorney informed Bollig's lawyer that Eberle had acknowledged giving false testimony in this case. After Eberle was criminally charged, he entered into a diversion agreement to resolve the case against him. Bollig's lawyer obtained a copy of the diversion agreement and relied on it in filing a motion for a new trial.

Eberle's diversion agreement included a stipulated factual statement. We described the relevant portion of the stipulation this way in *Bollig III*:

3

"The stipulation recites Eberle's testimony at Bollig's preliminary hearing that he did not use video equipment available in the police station to record the two interviews with Bollig and that he had never recorded anybody. During Bollig's trial, Eberle reiterated that the interviews had not been recorded, and he told the jurors he wasn't familiar with the video recording equipment. The stipulation states that Eberle later admitted to a KBI agent that he had recorded interviews of suspects before Bollig's preliminary hearing and trial. In the diversion agreement, Eberle further stipulated that he 'intentionally and falsely testified to a material fact . . . during the BOLLIG trial in 2014 and 2015' in that respect." 2020 WL 3566537, at *2.

After receiving Bollig's motion and the supporting documents, including the diversion agreement, the district court held what it characterized as a "preliminary inquiry" to determine whether an evidentiary hearing should be scheduled. Based largely on the content of the diversion agreement, the district court decided not to receive additional evidence, determined what Bollig had presented was insufficient to warrant a new trial, and denied the motion without providing any detailed findings and conclusions. Bollig appealed the denial of his motion.

In *Bollig III*, we reversed and remanded to the district court with directions to hold an evidentiary hearing. Because the stipulation in the diversion agreement did not in any way suggest Eberle's perjury was limited to what it recited, we concluded Bollig should have been afforded the opportunity to develop the extent of Eberle's misconduct in a full hearing. 2020 WL 3566537, at *4.

The district court conducted an evidentiary hearing on Bollig's motion for a new trial in March 2021. Bollig neither called Eberle as a witness nor presented evidence of instances of his perjury apart from those in the diversion agreement. Rather, Bollig testified and primarily restated his version of the meetings with Eberle and Campbell and the denial of any wrongdoing he offered at trial.

4

The district court issued a thorough written ruling in early July denying Bollig's motion for a new trial. The district court concluded Eberle's false testimony about being unfamiliar with the recording equipment in the police department's interview room and having never videotaped an interview there did not materially change the credibility determinations it had made in deciding the motion to suppress. The district court, therefore, ruled it had correctly denied the motion to suppress and, in turn, had properly admitted at trial the incriminating text messages extracted from Bollig's smartphone to prove the conspiracy. Likewise, the district court found Eberle's false testimony at trial concerned peripheral circumstances divorced from the substantive evidence of Bollig's guilt and would not have likely caused the jurors to change their verdict on the conspiracy to commit murder charge.

Bollig has again appealed the denial of his motion for a new trial. We now review the district court's written ruling from July 2021 in light of the evidentiary hearing held four months earlier.

LEGAL ANALYSIS

We set out the standards of appellate review governing a district court's ruling on a criminal defendant's motion for a new trial in *Bollig III* and restate them here:

> "As provided in K.S.A. 2019 Supp. 22-3501(1), a district court may grant a criminal defendant a new trial 'if required in the interest of justice.' The statute specifically allows a defendant to seek relief within two years of a final judgment based on newly discovered evidence. Nobody disputes the timeliness of Bollig's motion nor suggests some other procedural obstacle to our consideration of the district court's ruling.
>
> "Despite the broad charge in K.S.A. 2019 Supp. 22-3501(1), courts view motions for new trials based on new evidence with disfavor. *State v. Moncla*, 269 Kan. 61, 64, 4 P.3d 618 (2000); *State v. Krider*, 41 Kan. App. 2d 368, 384, 202 P.3d 722 (2009). Courts generally ascribe an assumption of regularity to a jury trial and the resulting verdict—that

witnesses take the oath seriously and endeavor to tell the truth as they know it and jurors diligently apply the law they are given to the facts they find to render a true verdict. Newly discovered evidence challenging that assumption often entails an assertion from a reluctant State's witness subpoenaed to testify at trial that he or she did so falsely. And the recanting witness is sometimes a friend, relative, or other associate of the defendant. Recanting witnesses tend to be viewed with skepticism, again on the assumption their trial testimony ought to be accepted absent compelling contrary reasons. See *State v. Norman*, 232 Kan. 102, 109, 652 P.2d 683 (1982); *State v. Lewis*, 33 Kan. App. 2d 634, 651, 111 P.3d 636 (2003).

"An appellate court reviews the ruling on a motion for a new trial for abuse of discretion. *State v. Phillips*, 309 Kan. 475, 477, 437 P.3d 961 (2019). A district court oversteps that discretion if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011)." 2020 WL 3566537, at *3.

This is an atypical new trial issue in that there is no question Eberle perjured himself in the prosecution of Bollig. In the common scenario, a reluctant State's witness later recants his or her trial testimony inculpating the defendant. So, a critical determination rests on figuring out *when* the witness told the truth—during the trial or in recanting? Here, the key questions are the extent of Eberle's perjury and what impact those prevarications would likely have had on the fact-finders.

Our review looks at two interconnected issues that spin off Eberle's credibility, as the district court recognized and as we suggested in *Bollig III*. 2020 WL 3566537, at *10. First, would Eberle's admitted perjury have caused the district court to reassess and change its credibility determinations in ruling on the motion to suppress and, in turn, to grant the motion? Exclusion of the text messages at trial would have dealt a highly injurious (and perhaps fatal) blow to the State's evidence establishing the criminal conspiracy. Second, would the jurors have "likely" reached a different conclusion if they

knew about Eberle's perjury? See *State v. Dean*, 310 Kan. 848, 856, 450 P.3d 819 (2019) (newly discovered evidence must be of such materiality, it likely would have produced different result at trial).

On the first, we filter our review through the appellate standards for examining district court rulings on motions to suppress. In reviewing those rulings, we apply a well-known bifurcated standard. We ask whether substantial competent evidence supports the factual findings, giving due deference to the district court's reconciliation of conflicting evidence and any related credibility determinations. We then consider whether those findings support the legal conclusion, a call we make without deferring to the district court's ultimate ruling in granting or denying the motion to suppress. *State v. Bates*, 316 Kan. 174, 183-84, 513 P.3d 483 (2022); *State v. Martinez*, 296 Kan. 482, 485, 293 P.3d 718 (2013).

After seeing and hearing both Eberle and Bollig testify at the suppression hearing, the district court found Eberle credible and Bollig unworthy of belief. We give great deference to those determinations, given how they are made. The primary mechanisms for measuring the candor and reliability of a witness are: (1) the taking of an oath to tell the truth; (2) the rigor of cross-examination to test the statements; and (3) the fact-finder's opportunity to gauge demeanor, especially on cross-examination. See *State v. Becker*, 290 Kan. 842, 846, 235 P.3d 424 (2010); *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008). As appellate judges, we defer to those credibility decisions precisely because the district court has had the opportunity to observe the witnesses as they testify—a unique vantage point we cannot replicate from a transcript. Accordingly, the appellate standard heavily insulates the district court's factual findings resting on the credibility of witness testimony and the resolution of conflicting testimony.

Those considerations drive our review of the first issue. Following the hearing on Bollig's motion for a new trial, the district court was fully informed of the evidence bearing on Eberle's perjury. And the district court concluded that evidence would not have shifted its original credibility determination—a conclusion that is itself a credibility determination. We, therefore, will not second-guess the district court's assessment. In turn, that conclusion furnishes sufficient evidence to support the district court's finding it would not change its ruling on Bollig's motion to suppress. We cannot ascribe legal or factual error to that part of the district court's decision in denying Bollig's motion for a new trial.

As to the second issue, the district court concluded Eberle's perjured testimony about not having ever used the recording equipment in the police interview room would not have sufficiently swayed the jurors to find Bollig not guilty of the conspiracy. We look at the district court's decision through the decidedly deferential abuse of discretion standard. Here, the district court understood the facts; it both presided over the jury trial and heard the evidence Bollig produced in support of his motion for a new trial. Most relevantly, the district court had a copy of Eberle's diversion agreement that outlined all of the perjurious statements Bollig relied upon for relief. The district court understood the legal principles applicable to motions for new trials; it cited the correct standard and supporting case authority in its written order denying the motion. We are then left to inquire, as the remaining measure for an abuse of discretion, whether no reasonable trial judge would have come to the same conclusion in these circumstances. We are confident the district court would not stand alone in finding the jurors still would have convicted Bollig if they knew of Eberle's false testimony.

The district court recognized that the guilty verdict was supported with significant evidence entirely independent of Eberle's trial testimony. For example, the conspiratorial agreement between Bollig and the nurse was proved through the text messages from

8

Bollig's smartphone. Eberle's trial testimony had no bearing on the content of those messages or the jurors' assessment of them. Bollig's former girlfriend testified he told her that he hid Mifepristone in her food. That confession was separate from the one Eberle described Bollig making to him and agent Campbell at the police station. The jury had copies of text messages between Bollig and his girlfriend discussing the possibility of an abortion. His girlfriend told him she did not want a medication abortion under any circumstances. She later informed him she decided against an abortion. Finally, Bollig's testimony describing his girlfriend putting the Mifepristone on the pancakes herself made little sense and, thus, lacked credibility, as we pointed out in *Bollig I*. In doing so, we posited a series of hypothetical questions we expect reasonable jurors would have asked of themselves or collectively in their deliberations:

> "Why would [Bollig's girlfriend] opt for a medication abortion after she had adamantly rejected that idea even when she and Bollig weighed terminating the pregnancy? Why would [she] have had Bollig obtain drugs for a medication abortion after she told him she intended to have their child? Why would [she] have asked Bollig to order Mifepristone and Misoprostol from a foreign supplier rather than asking her physician? Why wouldn't she simply take the Mifepristone pill with a sip of water rather than going through some odd ritual with the pancakes? And why wouldn't she later take the Misoprostol, as the protocol for the drugs required?" 2018 WL 1976689, at *9.

All of that trial evidence amply backs up the district court's reasoning in concluding Eberle's perjury, as recited in the diversion agreement, would not have affected the jurors' overall evaluation of the case and their resulting guilty verdict. More to the point here, it illustrates why other district courts readily would have made the same call in denying the motion for a new trial. The district court did not abuse its discretion in so ruling.

Affirmed.