NOT DESIGNATED FOR PUBLICATION

No. 108,773

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

KEVIN HOWARD SHIVES,
*Appellant.*

MEMORANDUM OPINION

Appeal from Johnson District Court; PETER V. RUDDICK, judge. Opinion filed December 11, 2015. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, senior deputy district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., LEBEN and BRUNS, JJ.

*Per Curiam*: Kevin Shives appeals his 2011 conviction for the rape of a child under 14 years old and aggravated sodomy of a child under 14 years old.

First, Shives contends that the district court should have admitted DNA evidence from sperm found on the victim's pajama pants. The jury was informed that Shives' DNA wasn't found on the pants but not that someone else's sperm was—and that DNA testing couldn't exclude the victim's father or brothers as the source. The State counters that the district court properly excluded the DNA as irrelevant evidence of past sexual conduct.

Because the presence of other DNA wasn't relevant to whether Shives sexually assaulted the victim or to Shives' defense that the victim fabricated the allegation to get removed from her house, the district court properly excluded the evidence.

Second, Shives challenges the district court's decision to allow the State to present evidence related to his 2004 Illinois conviction for the indecent solicitation of a child less than 14 years old. This evidence was admitted to show that Shives had such a similar method of committing these crimes that it would be reasonable to conclude he had committed this crime based on the earlier one. Shives argues that the facts of the earlier crime weren't "strikingly similar" to the facts in the current charged crime, as required for evidence to be admitted for this purpose. See *State v. Torres*, 294 Kan. 135, 136, 273 P.3d 729 (2012). But 2009 amendments to the statute addressing admissibility of past crimes permit evidence of past sexual misconduct to show the defendant's propensity to commit sexual offenses. L. 2009, ch. 103, sec.12; K.S.A. 2014 Supp. 60-455(d). Because the evidence would inevitably be admitted at retrial, any error is harmless and not grounds for reversing Shives' convictions. See *State v. Spear*, 297 Kan. 780, 789, 304 P.3d 1246 (2013).

Third, Shives challenges the district court's rejection of his claim for ineffective assistance of counsel. He contends that his trial attorney was ineffective because the attorney failed (1) to present the victim's mental-health records at trial, (2) to call an expert witness to testify about the victim's lack of injuries, and (3) to hire an expert witness to testify about the possible effects of the victim having discussed the rape with multiple untrained interviewers. But the district court held an evidentiary hearing, and the district court's ruling that these decisions were strategic choices, not evidence of inadequate representation, is supported by the evidence. See *State v. Betancourt*, 301 Kan. 282, 311, 342 P.3d 916 (2015). We find no error by the district court and affirm its judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2010, 13-year-old S.L. lived in an apartment in Overland Park with her parents and two brothers. Kevin Shives lived in the same apartment complex, in a building across the courtyard from S.L.'s family.

S.L. and her family were aware that Shives was a registered sex offender. Shives had initially become friends with S.L.'s father at counseling and frequently had dinner and attended church with S.L.'s family. Shives often brought S.L. candy, pop, and juice, and she referred to him as "uncle."

On April 1, 2010, S.L.'s mother, Sheila, decided to take her two sons to the pool while S.L. stayed home. S.L.'s father was away for work in Illinois and got back around midnight. In the late afternoon, S.L. was outside playing with some neighbor kids when she heard the phone ring inside. By the time she got inside, the phone had stopped ringing; she called Shives after seeing his name on the caller ID.

According to S.L., Shives wanted cigarettes; she told him that her family didn't have any, but he walked over to her family's apartment anyway. A neighbor reported seeing Shives walk into S.L.'s apartment around 5:30 p.m. S.L. testified that Shives had looked around the house for cigarettes and then sat on the couch with her. S.L. then asked Shives if he still had his webcam. S.L. testified that Shives replied, "Yes, but you will have to come over to my house and get it."

According to S.L., she followed Shives to his apartment. S.L. said that she stood in Shives' living room while he went into his bedroom and called her to join him. S.L. said that he pulled her by the arm into the room. S.L. testified that Shives unplugged the webcam from his computer and that she took it from him. She said that Shives then stood

3

in the doorway and said, "You can't go home yet." According to S.L., she told him that she wanted to go home, and he replied, "You will go home in a minute."

S.L. testified that Shives then put his hand down her pants, put his finger inside her vagina, and said, "You are tight. I want to hit that." She stated that Shives told her to take her pants off, so she started pulling them down, and Shives assisted. At trial, S.L. reported that she was first lying on her back when Shives put his penis inside her vagina. She testified that he then turned her over onto her stomach and put his penis inside her vagina from the back. S.L. thought that Shives ejaculated inside her vagina because she felt semen running down her leg, but she wasn't sure. She testified that Shives then told her to get on her knees; she said he then put his penis inside her mouth and ejaculated.

S.L. said that she was wearing a brown eagle T-shirt and a pair of Tinkerbell pajama pants when she went over to Shives' apartment. She said that semen got on her brown eagle shirt, that Shives told her to take it off, and that he gave her a black West Coast Choppers shirt to wear. She put that shirt and her pajama pants on and ran home.

Shortly after S.L. got home, her mother and brothers returned from swimming. Shives also came over about the same time. Shives asked Sheila if S.L. could have the webcam. Sheila testified that she told him absolutely not and noted that Shives was acting "all out of sorts" that night. According to S.L., Shives then came in her room and handed her the webcam, saying, "Here, hide this." S.L. said that she put it in her drawer. Sheila later retrieved the webcam from the drawer and gave it to police. S.L. also testified that Shives said, "Don't tell on me or I will get in serious trouble." S.L. said that she didn't tell anyone at that point because she was scared and "didn't know what to do."

Two days later, when S.L. was at her friend Megan's house, she told Megan that she had been raped by Shives. Megan encouraged S.L. to tell S.L.'s parents about the

4

rape. Because S.L.'s parents were friends with Shives, she didn't want to tell them, but she and Megan told Megan's mother about it.

Later that evening, S.L.'s father, Charlie, texted S.L. that she was missing out on the pies he was making. She responded that she didn't care, which Charlie found odd because they were her favorite type of pie. Charlie asked S.L. why she had such an attitude, and she responded that she needed to tell him something in person. When Charlie arrived, Megan's mother told him that S.L. said she had been raped. Charlie testified that S.L. had said, "Dad, Kevin [Shives] raped me."

The next day, April 4, Charlie and S.L. went to the police. Charlie told the police officer that S.L.'s words to him were: "[Shives] f--ked me and I am not lying to you." S.L. spoke to Officer Eboni McNabb about the allegations. McNabb asked S.L. to clarify what she meant by that statement and asked S.L., "Do you mean he put himself inside you?" S.L. said yes and later used McNabb's phrase with a specialist trained in interviewing children after allegations of abuse.

S.L was then sent to a hospital where medical officials administered a sexual-assault kit and collected evidence. No traces of Shives' semen or DNA were found. S.L.'s physical examination showed no signs of injury.

On the same day, police stopped Shives and told him that detectives wanted to speak with him. Unprompted, Shives told the police that he had had a rough time in the year since his daughter had died. Shives then said that he had befriended a family with a daughter who reminded him of his daughter but that "he was trying to distance himself from them so people didn't get the wrong idea."

Detective Wedel interviewed Shives at the police department. According to Wedel, Shives said that on April 1, around 4 p.m., he went over to S.L.'s apartment as

5

Sheila, her son, and S.L. were going to go to the pool, and then he went home. He told Wedel that he came back later in the evening and brought the webcam because S.L. had asked for it earlier in the day. During the interview, Shives reportedly referred to S.L. as "baby girl." He acknowledged that he had a West Coast Choppers shirt but said he hadn't seen it in a while. Wedel also asked him if police would find any of S.L.'s clothes at Shives' apartment; he responded, "Not to my knowledge." After the interview, Shives allegedly told a police officer that the "detectives wouldn't find the article of clothing they were looking for in his room because it was never there."

Police collected the pajamas, underwear, and West Coast Choppers T-shirt that S.L. said she had worn on April 1. The pajamas and underwear did not have Shives' DNA on them. Testing revealed a semen stain on the West Coast Choppers T-shirt that matched Shives' DNA and included DNA from someone other than S.L. As for the brown eagle shirt, Sheila told police that she had done laundry on April 3 and thought she remembered washing and placing it on S.L.'s bed, but she was never able to find it.

At the trial in April 2011, the State called D.G. to testify about Shives' previous conviction for indecent solicitation of a child under the age of 14 in Illinois. She recounted the following events, which took place when she was 11. She knew Shives as a friend of her mother's boyfriend. Shives often spent time with her family and was very friendly toward her, sometimes kissing her on the cheeks or lips before leaving. In October 2004, she went over to Shives' apartment with her mother's boyfriend to clean up after a Halloween party, but at some point, the boyfriend left. Shives called her over to his computer and asked her to touch his penis, but she said no. He then offered her money, but she again declined. D.G. asked Shives where she could find a broom, and he told her that it was in his bedroom closet, so she followed him. Once in his room, Shives bent D.G. over the bed and pulled her pants down. Shives told D.G. not to tell anyone or she would get taken away from her family. D.G. was able to get free and ran home.

6

In closing argument, the State focused on the similarities between D.G.'s and S.L.'s testimony, including their ages, how Shives met them through male figures, and how he was inappropriately affectionate with them.

During the trial, Shives' attorney pointed out inconsistencies in S.L.'s story and her history of lying. During cross-examination, S.L. admitted to lying to the police when she claimed to have gone to Shives' house for soda or candy on the day of the incident; she said she had wanted to avoid getting in trouble for the webcam. Although S.L. testified that Shives had penetrated her from the front and back, she had previously told a specially trained child interviewer that Shives had penetrated her only from the front. S.L. also admitted that she had falsely reported her parents for child neglect and had run away before the incident. She conceded that she was unhappy in Overland Park because all of her friends lived in Olathe and that her parents fought. In closing, Shives' attorney emphasized the lack of DNA and medical evidence, as well as S.L.'s history of making false allegations and lying.

The jury found Shives guilty of rape of a child under 14 years of age and of aggravated sodomy of a child under 14 years of age. He was sentenced to life imprisonment without parole for 620 months for the rape charge and life imprisonment without parole for 25 years for the aggravated-sodomy charge; the sentences were made concurrent to one another.

Following the trial, Shives requested a new trial, based in part on claims of ineffective assistance of counsel. The district court held an evidentiary hearing on that claim. Afterward, the district court rejected the ineffective-assistance-of-counsel claim and denied the request for a new trial. Shives has now appealed to this court.

ANALYSIS

I. *The District Court Did Not Abuse Its Discretion in Excluding DNA Evidence.*

Shives challenges the district court's decision to exclude DNA evidence from a sperm stain found on the pajamas S.L. was wearing during the alleged sexual assault. Shives' DNA wasn't found, but testing couldn't exclude S.L.'s brothers or father from having contributed the stain. The jury was told only that Shives' DNA wasn't found on the pants. The State argues that the evidence was properly excluded under the Kansas rape-shield law as irrelevant evidence of S.L.'s past sexual conduct.

The Kansas rape-shield statute, found at K.S.A. 21-3525 when the case was tried (now found at K.S.A. 2014 Supp. 21-5502), provides that evidence of a complaining witness' previous sexual conduct with any person is generally not admissible at trial. To get such evidence admitted, the defendant must file a motion before trial and demonstrate that the evidence will be relevant and otherwise admissible. K.S.A. 21-3525(b). The statute's purpose is to protect a victim of sexual abuse from unnecessary embarrassment and trauma resulting from *irrelevant* evidence of past sexual activity and to encourage victims to report and prosecute sexual crimes. *State v. Arrington*, 251 Kan. 747, 749-50, 840 P.2d 477 (1992).

Relevance is the key consideration when applying the rape-shield statute. *State v. Gilliland*, 294 Kan. 519, 540, 276 P.3d 165 (2012). K.S.A. 60-401(b) defines relevant evidence as evidence that is material and probative. *State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352 (2010). Evidence is material if it establishes a fact that is at issue and has some real bearing on the decision in the case. *State v. Holman*, 295 Kan. 116, 132, 284 P.3d 251 (2012); *State v. Howard*, 51 Kan. App. 2d 28, 42, 339 P.3d 809 (2014), *petition for rev. filed* January 5, 2015.

We review whether evidence is material independently, without any required deference to the district court. *State v. Torres*, 294 Kan. 135, 139, 273 P.3d 729 (2012). Evidence is probative when it establishes proof of some fact at issue. *Holman*, 295 Kan. at 132-33; *Howard*, 51 Kan. App. 2d at 42. We review the district court's determination about whether evidence was probative for an abuse of discretion. *Berriozabal*, 291 Kan. at 586. A district court abuses its discretion if no reasonable person would have taken its view or if its ruling is based on an error of law or fact. *Howard*, 51 Kan. App. 2d at 42. In other words, the district court's determination of whether the evidence was probative won't be overturned on appeal if reasonable minds could disagree about the court's decision. *Berriozabal*, 291 Kan. at 586.

The Kansas Supreme Court has concluded that evidence of past sexual conduct may be material if it is relevant to issues such as the identity of the rapist, consent of the complaining witness, or whether the defendant actually had intercourse with the complaining witness. *Holman*, 295 Kan. at 139. In *State v. Perez*, 26 Kan. App. 2d 777, Syl. ¶ 3, 995 P.2d 372 (1999), *rev. denied* 269 Kan. 939 (2000), our court listed several factors for a court to consider when determining the relevance of the complaining witness' past sexual conduct:

> "(1) whether there was prior sexual conduct by complainant with defendant; (2) whether the prior sexual conduct rebuts medical evidence on proof of origin of semen, venereal disease, or pregnancy; (3) whether distinctive sexual patterns so closely resembled defendant's version of the alleged encounter so as to tend to prove consent or to diminish complainant's credibility on the questioned occasion; (4) whether prior sexual conduct by complainant with others, known to the defendant, tends to prove he or she believed the complainant was consenting to his or her sexual advances; (5) whether sexual conduct tends to prove complainant's motive to fabricate the charge; (6) whether evidence tends to rebut proof by the prosecution regarding the complainant's past sexual conduct; (7) whether evidence of sexual conduct is offered as the basis of expert psychological or psychiatric opinion that the complainant fantasized or invented the acts charged; and (8)

9

whether the prior sexual conduct and the charged act of the defendant are proximate in time."

In our case, the State requested before trial that the court prohibit Shives from introducing the DNA evidence, arguing it was inadmissible under the rape-shield statute. The district court held a hearing on the motion.

The State argued that the evidence wasn't relevant. According to the State, the identity of the rapist wasn't at issue because the central question wasn't who had raped S.L. but rather whether Shives had raped her. Consent wasn't at issue because S.L. was only 13 and not legally old enough to consent to sex. Finally, the State contended that the existence of DNA from sperm on her pajamas that could possibly belong to her father or brothers didn't affect her credibility, noting that the pajama pants had been found on the bathroom floor.

Shives argued the DNA evidence offered insight into S.L.'s credibility, motive, and bias. He theorized that S.L. had fabricated the rape allegations to get removed from her house by child services and argued that the DNA evidence supported his theory. Shives' attorney stated, "How their DNA got on her pajamas—I am not going to get into and try to present evidence that they had sex at some point. I'm just going to point out their DNA, their sperm is on this little girl's pajamas." The State countered that Shives' argument "ma[de] no sense" because accusing her neighbor, Shives, of rape wouldn't get her removed from her own house. Shives' attorney replied that perhaps S.L. thought that accusing someone nearby would allow child services to remove her from the home but noted that the most important point was that the DNA evidence excluded Shives.

The district court found that the DNA evidence was inadmissible but that "[i]t certainly would be relevant and admissible that [Shives'] DNA wasn't on [the pajamas]." At trial, the jury was told that there was no DNA from Shives on the pants but wasn't told

about the sperm stain or how testing couldn't exclude S.L.'s father or brothers as the source of the sperm.

In analyzing the relevance of challenged evidence, we should first consider the defendant's theory of the case. *Holman*, 295 Kan. at 133. Shives' theory was that S.L. made up the rape allegations against him as a way to get removed from her house, just as she had falsely accused her parents of neglect. The central issue is whether Shives sexually assaulted S.L. The lack of DNA evidence from Shives was highly relevant in determining the issue, and the district court correctly admitted it. But the evidence of sperm on S.L.'s pajamas that possibly came from her father or brothers doesn't help prove whether Shives sexually assaulted S.L. on April 1 as alleged. It is irrelevant evidence of possible other sexual conduct that the rape-shield statute is designed to prevent from coming in. And the conduct may or may not have involved S.L.—the pajama bottoms were found on the bathroom floor, and her father and brothers used the same bathroom.

In support of his argument that the court should have admitted the evidence, Shives cites *State v. Bourassa*, 28 Kan. App. 2d 161, 168-72, 15 P.3d 835 (1999). Bourassa was accused of kidnapping and raping a mentally challenged 11-year-old, V.R. He wanted to present evidence that V.R. had previously accused her father of sexually assaulting her and had been with her father on the morning of the day that Bourassa allegedly kidnapped her from a park and raped her. The district court denied his motion, claiming that the evidence wasn't relevant and material. Bourassa's theory of the case was that it could have been her father who molested her, especially as no DNA evidence from Bourassa was found. This court ordered that Bourassa be granted a new trial because the evidence was highly relevant and because preventing Bourassa from presenting it violated his fundamental right to a fair trial. 28 Kan. App. 2d at 169, 173.

We do not find *Bourassa* applicable here. Shives didn't argue that it was actually S.L.'s father or brothers that sexually assaulted her on April 1. In fact, it was uncontested

11

that at the time the crime was alleged to have taken place, S.L.'s father was out of town working, and her brothers were at the pool with her mother. Nor did the exclusion of this evidence substantially prevent Shives from presenting his theory of defense. At trial, Shives presented evidence that S.L. was unhappy at home and had run away, had fabricated allegations of neglect, and knew that accusing Shives of sexual assault would result in him being arrested. In closing, Shives emphasized that it wasn't his burden to prove S.L.'s motive for falsely accusing him, whether that was to get out of the house or for other reasons.

Evidence about the source of DNA from the sperm sample found on S.L.'s pajamas had no relevance to whether Shives raped her that day. The district court did not err in excluding the evidence.

II. *The District Court's Decision to Admit Evidence of Shives' Previous Sexual Offense Did Not Deprive Shives of a Fair Trial.*

Shives argues that the district court should not have allowed the State to introduce evidence of his previous sex offense involving D.G. The State argues that the district court properly admitted the evidence to show Shives' plan or method.

Kansas appellate courts review a district court's decision to admit evidence in a two-step process. *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014). First, we determine whether the evidence was relevant; relevant evidence is (1) material, meaning it supports a fact at issue and (2) probative, meaning it could logically prove a material fact. 299 Kan. at 348. Materiality is reviewed independently, without deference to the district court's determination, while whether evidence is probative is reviewed for abuse of discretion. 299 Kan. at 348. Second, if the evidence was relevant, we then apply any relevant statutes addressing admission and exclusion of evidence. 299 Kan. at 348. If the district court had to determine whether the probative value of the evidence outweighed

the potential for undue prejudice against the defendant, we review that determination for abuse of discretion. *Torres*, 294 Kan. at 140.

As a general rule, whatever the past crime or wrongdoing that is being considered, evidence of a person's earlier crimes or wrongdoings can't be admitted to prove that person's propensity, or tendency, to commit another crime later. K.S.A. 60-455; K.S.A. 2014 Supp. 60-455(a). But the evidence may be admitted to prove some other material fact, such as motive, opportunity, or plan, if its probative value outweighs the potential for undue prejudice against the defendant. *Torres*, 294 Kan. at 140; K.S.A. 60-455; K.S.A. 2014 Supp. 60-455(b).

There are specific evidentiary rules about evidence of past sex crimes, however, and we must take stock of a key statutory amendment made in 2009. Until 2009, if the State wanted to present evidence of a defendant's past sexual misconduct, it had to show that the evidence was relevant to prove some fact in the case at hand. See, *e.g.*, *State v. Prine*, 287 Kan. 713, 724, 726-27, 200 P.3d 1 (2009) (*Prine I*). In 2009, as a response to *Prine I*, the legislature amended K.S.A. 60-455. One of the new provisions, K.S.A. 2014 Supp. 60-455(d) allows the State to use relevant evidence of a defendant's past sexual misconduct to show his or her propensity to commit sexual offenses. *Bowen*, 299 Kan. at 348, 350. The Kansas Supreme Court has assumed that the district court must still conduct the balancing test of probative value and undue prejudice before admitting the evidence to prove propensity. *State v. Dean*, 298 Kan. 1023, 1033, 324 P.3d 1023 (2014).

Although this crime took place in 2010, after the 2009 amendments, and the trial took place in 2011, the trial transcript shows uncertainty on the part of the attorneys and the district court regarding how to interpret the 2009 amendment to K.S.A. 60-455. Perhaps reflecting that uncertainty, the State didn't request that the evidence of Shives' 2004 crime be admitted to prove his propensity to commit this crime under the amended statute. Instead, the State requested to use the evidence to prove that Shives had a plan or

pattern of conduct, something that would have made the evidence admissible under either the old statute or the amended one.

The district court ultimately allowed the evidence to come in to prove Shives' plan: "I think it is evidence of [a] plan. I think there is a logical connection. I think it comes in as relevant aside and apart from predisposition because of the similarity. I'm going to leave it at that." The jury was instructed to only consider the prior crime as evidence of Shives' plan or method.

Since the time of the trial in this case, the Kansas Supreme Court has clarified how evidence may be admitted under K.S.A. 2014 Supp. 60-455(d). In *State v. Prine*, 297 Kan. 460, Syl. ¶ 3, 303 P.3d 662 (2013) (*Prine II*), the court held that K.S.A. 2014 Supp. 60-455(d) allows evidence of prior sexual misconduct to be admitted to prove a defendant's disposition to commit the current charged crime. The evidence of Shives' 2004 crime could have come in under K.S.A. 2014 Supp. 60-455(d) to show his predisposition to sexually abuse female victims approximately the same age as S.L. See *State v. Bowen*, 299 Kan. 339, 349-50, 323 P.3d 853 (2014). But the evidence was admitted to prove Shives' plan and method. We usually review the actual ruling the district court made, not another evidentiary ruling it could have made. *State v. McCune*, 299 Kan. 1216, 1226, 330 P.3d 1107 (2014) (refusing to analyze admission of evidence under K.S.A. 2014 Supp. 60-455[d] when district court relied on other grounds). So we start here by considering whether the evidence was properly admitted to show Shives' plan.

Plan evidence may be admitted when the method of committing the prior act is so similar to the method in the charged crime that it's reasonable to conclude the same person committed both acts. *State v. Longstaff*, 296 Kan. 884, 893, 299 P.3d 268 (2013). The methods in the cases must be "'so strikingly similar in pattern or so distinct in method of operation as to be a signature.'" 296 Kan. at 893 (quoting *Prine I*, 287 Kan. at

14

735). We review the district court's decision under the "signature" standard for an abuse of discretion. *Torres*, 294 Kan. at 141. A district court abuses its discretion when no reasonable person would agree with its decision or the decision is based on a factual or legal error. *Longstaff*, 296 Kan. at 894-95.

In determining whether the "strikingly similar" standard is met, courts have compared the age and gender of the victims, the location of the incidents, the relationship with the victims, the alleged sexual acts, and other aspects of the earlier and current crimes. See 296 Kan. at 893-94. The crimes must have more in common than "the similarities common to nearly all sexual-abuse cases." *Torres*, 294 Kan. at 141.

There are several similarities between D.G.'s and S.L.'s accounts. The girls were similarly aged; D.G. was 11 and S.L. was 13. Shives came to know both girls as a family friend through a male figure in their lives—D.G.'s mother's boyfriend and S.L.'s father. He was inappropriately affectionate with both of them, giving D.G. kisses on the lips and cheeks and calling S.L. "baby girl." He reportedly called each girl into his bedroom to get something before allegedly assaulting them—a broom in D.G.'s case and a webcam in this case. Shives supposedly told both D.G. and S.L. not to tell anyone.

There are differences as well. Shives asked D.G. to touch his penis, but there's no similar allegation in this case. In D.G.'s case, Shives pulled her pants down and bent her over the bed, but he didn't penetrate her. In this case, S.L. alleges that Shives assisted her in taking her pants off and then penetrated her first while she was on her back and then when he had flipped her to her stomach.

The district court admitted the evidence because there was a "logical connection" between the two crimes, but the proper standard is whether the crimes were strikingly similar. Whether the similarities are striking is perhaps a close call here, but given the abuse-of-discretion standard applicable to our review, we find no abuse of discretion. The

15

evidence demonstrates that Shives had a pattern of befriending families with young girls, being very affectionate and friendly, and luring the girls into his bedroom on the pretense of retrieving something before attempting to sexually assault them.

Even if the district court abused its discretion in finding that the evidence met the striking-similarity test, we do not set aside a jury's verdict if the abuse of discretion was harmless. K.S.A. 2014 Supp. 60-261. To determine whether an error is harmless, we must determine that the error didn't affect a party's substantial rights—meaning that it didn't impact the trial's outcome. *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011). If the error involves a right guaranteed by the United States Constitution, we must be persuaded beyond a reasonable doubt that the error had no impact on the trial's outcome. 292 Kan. at 565. If a constitutional right is not at issue, then this court must be persuaded only that there is no reasonable probability that the error affected the trial's outcome. 292 Kan. at 565.

Shives wants the court to give him a new trial since he says it erred by admitting evidence of his past offense. But under the amended statute, K.S.A. 2014 Supp. 60-455, and the caselaw interpreting it, the evidence would be admitted in a retrial as propensity evidence. Shives acknowledges that the evidence could come in at a new trial. In *Prine II*, the Kansas Supreme Court held that the district court shouldn't have admitted evidence of an earlier sexual offense as plan evidence. But the court found it was harmless error and didn't require reversal because the court had "no doubt" that the evidence would be admitted at a new trial as propensity evidence under K.S.A. 2014 Supp. 60-455(d). 297 Kan. at 480; see also *State v. Spear*, 297 Kan. 780, 789, 304 P.3d 1246 (2013) (noting that *Prine II* "establishes that even if [the court] assume[s] error, that error does not require reversal"). Likewise, even if the district court shouldn't have admitted D.G.'s testimony as plan evidence, it was harmless error. There's "no doubt" that the evidence would come in at a new trial to show Shives' propensity to commit sexual offenses: When

16

discussing the amended statute, the district court said at trial that "[i]f you just apply the text [of the amended statute] as it stands now, I think this evidence would come in."

If the evidence was admitted in error as plan evidence at the first trial, it would still come into evidence as propensity evidence in a retrial. The error would be based on statutory rules of evidence, not constitutional principles, so we apply the nonconstitutional-harmless-error test. We find any error harmless because there is no reasonable probability that it affected the trial's outcome.

III. *The District Court Did Not Err in Denying Shives' Motion for a New Trial Based on Claims of Ineffective Assistance of Counsel.*

Shives' final claim on appeal is that the district court should have granted his motion for a new trial because his counsel was ineffective. First, he contends that his lawyer, Michael McCulloch, should have introduced evidence of S.L.'s mental-health issues. Second, he asserts that McCulloch should have called an expert to discuss S.L.'s lack of injury following the rape. Third, he claims that McCulloch should have called a witness to testify about the effect of S.L.'s discussions about the rape before her interview with a trained professional. The district court held an evidentiary hearing at which McCulloch testified. Afterward, the court rejected Shives' claim because it found that McCulloch had "vigorously defended" Shives and that his actions had all been justifiable decisions based on trial strategy.

A claim alleging ineffective assistance of counsel presents mixed questions of fact and law. *State v. Burnett*, 300 Kan. 419, 452, 329 P.3d 1169 (2014) (citing *State v. Cheatham*, 296 Kan. 417, 430, 292 P.3d 318 [2013]). When the district court has held a full evidentiary hearing, we review its factual findings to be sure that they are supported by substantial evidence; if they are, we must accept them. *State v. Betancourt*, 301 Kan. 282, 306, 342 P.3d 916 (2015); *Wilson v. State*, 51 Kan. App. 2d 1, 14, 340 P.3d 1213

(2014), *rev. denied* April 29, 2015. We review whether the defendant has met the two-part showing required to assert ineffective assistance of counsel independently, without any required deference to the district court. *Wilson*, 51 Kan. App. 2d at 14.

The Sixth Amendment to the United States Constitution guarantees that in criminal trials, "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The right to counsel necessarily includes the right to effective counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Chamberlain v. State*, 236 Kan. 650, 656, 694 P.2d 468 (1985) (adopting *Strickland*). To establish ineffective assistance of counsel, the defendant must show that (1) his or her attorney's work was below minimum standards and thus, constitutionally deficient and (2) that the attorney's deficient work prejudiced the defendant's defense. *State v. Coones*, 301 Kan. 64, 70, 339 P.3d 375 (2014) (citing *Strickland*, 466 U.S. at 687).

The first prong of the *Strickland* test requires determining whether the defendant's trial counsel's representation fell below an objective standard of reasonableness—that is, whether a reasonable attorney could have acted as the defense attorney acted at trial under the circumstances. *Coones*, 301 Kan. at 70; *Wilson*, 51 Kan. App. 2d at 14. In assessing the attorney's performance, a reviewing court must try to eliminate the distorting effects of hindsight, to reconstruct the circumstances of the attorney's challenged conduct, and to evaluate the conduct from the attorney's perspective at the time. *Coones*, 301 Kan. at 70. A reviewing court presumes that an attorney's actions fell within the wide range of reasonable professional assistance. *Burnett*, 300 Kan. at 452.

In evaluating ineffective-assistance-of-counsel claims, reviewing courts are highly deferential to an attorney's strategic decisions when those decisions are made after thorough investigation. The attorney makes the final decisions on what witnesses to call, whether and how to conduct cross-examination, and all other strategic and tactical matters after consulting with his or her client. *Edgar v. State*, 294 Kan. 828, 838-39, 283

P.3d 152 (2012). """Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . .""" *Betancourt*, 301 Kan. at 311 (quoting *Rowland v. State*, 289 Kan. 1076, 1083-84, 219 P.3d 1212 [2009]). But merely invoking the word "strategy" will not protect a lawyer from an ineffective-assistance-of-counsel claim """when counsel lacks the information to make an informed decision due to inadequacies of his or her investigation.""" *Edgar*, 294 Kan. at 839. The burden is on the defendant to show that the alleged deficiencies were not the result of strategy. *State v. Adams*, 292 Kan. 151, 167-68, 254 P.3d 515 (2011).

The second prong of the *Strickland* test requires showing that the attorney's substandard work prejudiced the defendant. To establish prejudice, the defendant must show a reasonable probability that without the attorney's deficient work, the result of the trial would have been different. *Betancourt*, 301 Kan. at 306. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Miller v. State*, 298 Kan. 921, 934, 318 P.3d 155 (2014).

Shives first contends that McCulloch's failure to pursue evidence concerning S.L.'s mental-health status constituted ineffective assistance. At a pretrial hearing, McCulloch requested that the trial court order a psychological examination of S.L., but the court denied the request. After the pretrial hearing but before the trial, Shives became aware that S.L. had received mental-health treatment in January 2011 for posttraumatic stress disorder, abuse and neglect, and sexual assault. The medical records from that treatment indicated that S.L. had had hallucinations of demons and angels since childhood, including one demon named "Charlie."

During the evidentiary hearing, McCulloch testified about why he hadn't presented this evidence at trial. He characterized the evidence as "damning" and "devastating." He stated that putting on the evidence would have opened the door for the State to suggest that S.L.'s mental-health issues were the result of Shives' actions:

19

"This evaluation gives the State a chance to put on a mental health professional to say that after this alleged assault this girl right before trial went out, apparently suicidal, in her pajamas in the middle of the night . . . and she was just despondent.

. . . .

"This report changes the way that the case can be tried. The case can be tried as this was a girl who lied, had a history of lying, she was lying about this . . . to get away from the family, etc. It changes [it] from wondering whether she is a victim to making her a victim and finding out whose victim she is."

According to Shives, McCulloch's decision to not introduce this evidence constituted ineffective assistance because the evidence would have shown that S.L. was "disconnected from reality and could have fabricated the allegations against Mr. Shives, without regard to the consequences of such allegations." Although the records would have shown S.L.'s mental-health issues, they also would have made her a victim in the eyes of the jury, as McCulloch suggests. It's clear that McCulloch made a deliberate strategic decision not to introduce the records after fully considering them and the impact they might have at trial, especially since the defense's theory was that S.L. had a history of lying and making false allegations. Strategic choices based on professional judgment are not grounds for ineffective-assistance-of-counsel claims. *Shumway v. State*, 48 Kan. App. 2d 490, 497, 293 P.3d 772 (citing *Flynn v. State*, 281 Kan. 1154, Syl. ¶ 5, 136 P.3d 909 [2006]), *rev. denied* 298 Kan. 1203 (2013).

Shives next contends that McCulloch was ineffective for failing to call the doctor he had retained to discuss the results of S.L.'s sexual-assault exam and the fact that she wasn't injured. The State argues that McCulloch made a strategic decision not to call the doctor after cross-examining the nurse who examined S.L.

During the trial, the State's witness, Lisa Moran, a Sexual Assault Nurse Examiner, testified that a lack of physical injuries doesn't mean a sexual assault didn't occur. On cross-examination, McCulloch asked Moran, "But it is also consistent that if there was no assault, that there would be no injuries?" Moran answered, "Yes." Moran also acknowledged that the evidence from a sexual-assault exam may indicate whether an assault even occurred.

McCulloch had retained a doctor who had reviewed the records to testify that S.L. didn't show any of the physical injuries one would expect after a violent sexual assault. McCulloch decided not to call the doctor as a witness because he felt Moran's testimony established that a lack of injuries could indicate the victim was not assaulted and was concerned that the State could cross-examine the doctor about how a sexual assault may not result in physical injuries. McCulloch testified, "I weighed the danger of putting on Dr. Hodges and allowing a vigorous cross-examination by the State that would risk basically our witness re-emphasizing the State's point."

It's generally not ineffective assistance of counsel to fail to call a witness who would only have repeated what others had said. *Bledsoe v. State*, 283 Kan. 81, 103, 150 P.3d 868 (2007); *Lewis v. State*, 33 Kan. App. 2d 634, Syl. ¶ 7, 111 P.3d 636, *rev. denied* 277 Kan. 924 (2003). The jury heard from Moran that a lack of physical injuries may indicate that there was no assault, although the existence of physical injuries does not prove whether a sexual assault occurred; they would have heard the same evidence from the doctor if he had been called.

Shives suggests based on *State v. Tully*, 293 Kan. 176, 262 P.3d 314 (2011), that McCulloch was required to call the doctor as a witness. In *Tully*, the court found that the district court shouldn't have allowed an emergency-room doctor to testify that a lack of injuries didn't mean a person hadn't been raped. 293

21

Kan. at 203-05. According to the court, this statement required the witness to apply the legal elements of rape, and the State hadn't established the doctor's expertise and qualifications to do so. 293 Kan. at 205. The court noted that this error by itself would have been harmless. 293 Kan. at 205. In this case, Shives argued that since Moran had testified about S.L.'s injuries without establishing that she was an expert, McCulloch should have called the doctor, established that he was qualified to talk about rape and S.L.'s examination, and allowed him to present his opinion that her lack of injury suggested she hadn't been assaulted.

Notably, *Tully* came out in September 2011, several months after the April 2011 trial in this case. Earlier cases permitted nurses and doctors with specialized training or extensive experience in sexual-assault cases, like Nurse Moran, to testify whether injuries were consistent with rape. See, *e.g.*, *State v. Humphrey*, 30 Kan. App. 2d 16, 21-26, 36 P.3d 844 (2001). Considering McCulloch's decision from his perspective at the time, not also calling the doctor was a reasonable trial strategy.

Even assuming that McCulloch should have objected to Nurse Moran's testimony and called his own expert, to support an ineffective-assistance-of-counsel claim, Shives still had to show he was prejudiced. Shives has not provided an argument about how this error prejudiced him. An issue not briefed by the party is deemed waived and abandoned. *State v. Boleyn*, 297 Kan. 610, 633, 303 P.3d 680 (2013).

Shives' final claim is that McCulloch was ineffective because he didn't call an expert to discuss possible effects of S.L.'s discussions about her assault with untrained interviewers before speaking to trained professionals. S.L. spoke to several people— including a boy named Matt, her friend Megan, Megan's mother, her parents, and police officers—before being interviewed at Sunflower House. Sunflower House is a children's

advocacy center where specially trained interviewers conduct neutral, nonleading, nonsuggestive interviews with children who have alleged abuse. McCulloch acknowledged that these interviews are important in abuse cases because untrained individuals may ask leading or suggestive questions or influence the child's account of what happened. He tried to interview many of the people who spoke with S.L. before the Sunflower House interview, but in most cases, he was unable to reach them or they refused to speak to him.

During the evidentiary hearing, McCulloch addressed why he had not consulted a psychological expert about suggestibility. He testified that he had considered it but that upon viewing the video of S.L.'s interview at Sunflower House, he determined that it would not be helpful. In particular, he noted that S.L. was almost 14 years old, was very willing to talk, and used very mature terms; his impression "was that she was trying to convince the social worker of things." McCulloch felt that consulting with an expert about suggestibility is most useful with younger children and decided that it wasn't necessary in this case, though he had done so in other cases. In closing arguments, he emphasized that S.L. had spoken to many people about the rape even before speaking to police and that her story had changed over time. He also noted that S.L. had adopted Officer McNabb's words to describe the rape at her later interview at Sunflower House.

Shives cites *Mullins v. State*, 30 Kan. App. 2d 711, 717-18, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002), to support his argument that McCulloch was ineffective on this claim. In *Mullins*, the defendant was accused of sexually assaulting his 7-year-old son. *State v. Mullins*, 267 Kan. 84, 85, 977 P.2d 931 (1999). The *Mullins* court found that the defendant's attorney was ineffective for failing to call an expert to testify about child-interviewing techniques, noting it was compelled to do so because the State presented no evidence or witnesses and only minimally cross-examined the defendant's expert witness at the ineffective-assistance-of-counsel hearing. 30 Kan. App. 2d at 718. Subsequent cases have limited *Mullins* to its facts because of the State's weak defense and have found

23

that an attorney is not ineffective merely because he or she fails to hire an expert on child-interviewing techniques. *E.g.*, *Wilkins v. State*, 286 Kan. 971, 983-84, 190 P.3d 957 (2008); *Lewis v. State*, 33 Kan. App. 2d 634, 646, 648, 111 P.3d 636 (2003); *Bejarano v. State*, No, 112,370, 2015 WL 6444250, at \*8-9 (Kan. App. 2015) (unpublished opinion) ("*Mullins* clearly does not establish a bright-line rule that a defense attorney must always consult an expert on child interviewing techniques in child sexual abuse cases.").

The question here is whether McCulloch's decision not to hire an expert was objectively unreasonable. At the hearing, Shives didn't present evidence about the necessity of hiring an expert on child interviewing; the only evidence was McCulloch's own testimony. McCulloch said that he had past experience and knowledge regarding child suggestibility and had consulted such experts in the past. He also testified that he had thoroughly reviewed the interview with Sunflower House and considered hiring an expert before ultimately deciding it was unnecessary given S.L.'s age and maturity. The trial record also reflects that McCulloch showed how S.L.'s story changed over time and how earlier interviews affected her retelling at later interviews. The district court's conclusion that McCulloch provided effective assistance is supported by the evidence; Shives has failed to prove that McCulloch's decision wasn't based on trial strategy made after an adequate investigation.

We affirm the district court's judgment.

24